CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

DEC 2 8 2012

JULIA C. DUDLEY, CLERK
BY: 
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| MICHAEL HASH, ) | |
| ) | |
| **Plaintiff,** ) | Civil Case No. _3:12-cv-00065_ |
| ) | |
| **v.** ) | |
| ) | |
| GARY CLOSE, SCOTT JENKINS, JAMES ) | **COMPLAINT AND** |
| MACK, CALVIN BRUCE CAVE, MARY ) | **JURY DEMAND** |
| PETERS DWYER, and PAUL CARTER, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |

Plaintiff MICHAEL HASH, by and through his attorneys, the law firm of Hunton & Williams LLP, states as follows:

## INTRODUCTION

1.     Plaintiff Michael Hash spent almost 12 years imprisoned – from the time he was 19 until after his 30th birthday – for a crime he did not commit.  In February 2001, Hash was wrongly convicted of the 1996 capital murder of Thelma Scroggins in Culpeper County.  Earlier this year, Judge James C. Turk of this Court vacated Hash's conviction because it "was brought about by [law enforcement] methods that offend a sense of justice" and was "an extreme malfunction in the state criminal justice system."  Judge Turk's opinion is attached to this Complaint as Exhibit A.

2.     The architects of Michael Hash's wrongful conviction were the Culpeper County Commonwealth's Attorney and officers with the Culpeper County Sheriff's Office, the defendants in this action.  These law enforcement officials engaged in a concerted and malicious effort to convict Hash for a brutal crime despite the total absence of credible evidence against him.  Among other unlawful acts, defendants fabricated multiple witness accounts implicating Hash in the crime by (a)

1

feeding witnesses information about the crime, (b) carefully coaching the witnesses in their false accounts, and (c) persuading the witnesses to lie by promising them favorable treatment. Defendant law enforcement officials also went to great lengths to suppress and withhold the evidence of their own misconduct to ensure Hash's false arrest, unfair trial, wrongful conviction, and continued imprisonment after his conviction.

3.     It was this "cavalcade of evidence [of] police and prosecutorial misconduct" that led Judge Turk to vacate Hash's conviction earlier this year.

4.     As a direct result of defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Michael Hash was deprived of his federal constitutional rights, was robbed of nearly twelve years of his life and freedom, and sustained severe physical, emotional, and economic damages.

## JURISDICTION

5.     Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over claims arising under 42 U.S.C. § 1983.

6.     Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the pendent state law claims.

## VENUE

7.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of Virginia, the judicial district in which the claims arose, and in which, upon information and belief, all defendants reside or conduct business.

## JURY DEMAND

8.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

9. Michael Hash is the Plaintiff in this matter. Hash was fifteen years old and a resident of Culpeper County when Thelma Scroggins was murdered in 1996. In February 2001, Hash was convicted of the capital murder of Thelma Scroggins and sentenced to life in prison without the possibility of parole. His conviction was vacated by this Court on February 28, 2012 and, in March 2012, Hash was released from prison. Hash currently resides in Albemarle County.

10. Defendant Gary Close was the Commonwealth's Attorney for Culpeper County from 1991 to 2012. Close was an active participant in the sham investigation that resulted in Hash's unjust conviction. Close was also the lead prosecutor in the case against Hash. Close resigned from his position as Commonwealth's Attorney on March 12, 2012, two weeks after Judge Turk's order vacating Hash's conviction.

11. Defendant Scott Jenkins is the Sheriff of Culpeper County. In 2000-2001, Jenkins was a deputy in the Investigations Division of the Culpeper County Sheriff's Office. Jenkins was the lead investigator in the investigation that resulted in the arrest, prosecution, and conviction of Michael Hash.

12. Defendant James Mack is the Chief Deputy Sheriff of Culpeper County. In 2000-2001, Mack was a deputy in the Investigations Division of the Culpeper County Sheriff's Office. Mack participated in the investigation that resulted in the arrest, prosecution, and conviction of Michael Hash.

13. Defendant Calvin Bruce Cave was, in 2000-2001, a sergeant in the Investigations Division of the Culpeper County Sheriff's Office. Cave supervised and was involved in the investigation that resulted in the arrest, prosecution, and conviction of Michael Hash.

14. Defendant Mary Peters Dwyer was, in 2000-2001, the Chief Jailer in the Culpeper County Sheriff's Office. During this time, Dwyer was responsible for the Culpeper County Jail.

15. Defendants Close, Jenkins, Mack, Cave, and Dwyer acted at all times under color of law

in connection with the conduct described in this complaint.

16.    Defendant Paul Carter, in 1998, pled guilty to federal charges relating to his participation in a conspiracy to distribute crack cocaine and was sentenced to fifteen years in prison. Thereafter, Carter became a prolific government informant. In 2000, Paul Carter was incarcerated in the Albemarle-Charlottesville Regional Jail where he shared a cell block with Michael Hash for one night. Because of his testimony at Hash's trial, Carter was released from prison in 2001. In conspiring with Culpeper County law enforcement officials, Carter acted under color of law in connection with his conduct described in this complaint.

## FACTS

### The Crime and the Initial Investigation

17.    Thelma Scroggins was found murdered in her home in Culpeper County on the morning of July 14, 1996. The Culpeper Sheriff's Office began an investigation under the supervision of Lieutenant David Carter. The victim had been shot four times in the head in a doorway between a hall and bedroom in her house. Blood, fingerprints, hairs and fibers were found at the scene, but none of this physical evidence was ever matched to any suspect.

18.    Based on the evidence, Lieutenant Carter concluded that a single assailant committed the crime and it was apparent robbery was not the motive for the crime.

19.    Lieutenant Carter investigated the murder from 1996 to 1999 but did not make an arrest. Michael Hash was at no point a suspect during Lieutenant Carter's investigation.

### Jenkins and Mack Take Over the Investigation

20.    In November 1999, a new Sheriff, Lee Hart, was elected and Lieutenant Carter left the Sheriff's Office. During his campaign for Sheriff, Hart prioritized making an arrest in the unsolved, three-year-old Scroggins murder.

21.     In early 2000, Sheriff Hart assigned Scott Jenkins to lead the investigation of the Scroggins murder, even though Jenkins had never led a homicide investigation. Sheriff Hart assigned James Mack to assist in the investigation, even though Mack had never investigated any major crime. In sworn testimony last year, Jenkins described Mack's lack of qualifications to participate in a homicide investigation:

> "James Mack had I don't think ever investigated anything more than a petty larceny in his entire career, and he spent four years prior as a jail officer under Sheriff Mitchell. . . . Mack is a black male. He was put in [the Investigations] division for that reason. They wanted a black officer in the division, and that's why he was put there. . . . He had absolutely, to my knowledge, no specialized training for investigations whatsoever. He was so to speak learning on-the-job training was what it was, assigned with me to this cold case. . . . I know it sounds horrible and it is embarrassing to think that an office did that, but that's the political nature of the sheriff's office, that people with no knowledge and experience are allowed to be put in positions that can bring horrible results."

22.     Calvin Bruce Cave was assigned to supervise Jenkins and Mack, even though he had never investigated a murder. According to Jenkins, Cave directed the investigation into the Scroggins homicide and was aware of everything Jenkins and Mack did in connection with the investigation.

23.     Virginia State Police Special Agent Wayne Carwile provided assistance in the investigation when asked by the Culpeper Sheriff's Office to do so.

24.     Jenkins, the lead investigator on the case, admitted in a 2010 sworn statement that he "believe[s] the Sheriff's Department investigation was not handled properly."

### Jenkins and Mack Procure Alesia Shelton's Fabricated Account Implicating Hash

25.     When Jenkins and Mack began their investigation in 2000, Hash was not a suspect. One of the first witnesses Jenkins and Mack interviewed was Alesia Shelton. Alesia Shelton is Hash's cousin and blamed the Hash family for the fact that, after several run-ins with the law, she was sent to a group home in Richmond in February 1996.

26.     In 1999, Shelton and her boyfriend shot a man six times in Culpeper County. Shelton

was sentenced to twenty-eight years incarceration with all but seven suspended. Because of some similarities between her crime in 1999 and the Scroggins murder in 1996, Investigators Mack and Jenkins interviewed Shelton multiple times while she was imprisoned for her crime.

27.     The first interview occurred on March 27, 2000 and was partially recorded. For most of that interview, Shelton insisted repeatedly and adamantly that she knew nothing about the Scroggins homicide. Deputies Mack and Jenkins offered to "help" Shelton or to "shorten [her] sentence" in exchange for information. Notwithstanding at least five such offers to help, Shelton maintained she knew nothing about the crime.

28.     Mack then interrupted the interview to take Shelton for a "cigarette break" outside, where Mack and Shelton had an unrecorded conversation. After that break, the recorder was turned back on and Shelton said, "that's when it hit me." She then vaguely described discussions that supposedly took place between Michael Hash and two other teenage boys, Jason Kloby and Eric Weakley, about the crime. Shelton then told Mack, "See, I told you I'd help," to which Mack responded, "And I appreciate that. . . . I'll try to be a man of my word too."

29.     Four days later, on March 31, 2000, Shelton was given a polygraph examination by the Virginia State Police. The test revealed that Shelton was deceptive in answering every single question that she was asked about her statement implicating Hash. According to Special Agent Carwile, a certified polygraph examiner, such a complete failure is unusual and noteworthy: "anybody that failed the examination to this extent wouldn't be a very credible witness in my opinion."

30.     Prior to Shelton's false account following the cigarette break, there was not a shred of evidence suggesting Michael Hash had anything to do with the murder of Thelma Scroggins.

**Jenkins, Mack, and Cave Procure Eric Weakley's Fabricated Account Implicating Hash**

31.     Jenkins and Mack next interviewed Eric Weakley. They interviewed him at least five

6

times in April and May 2000. In his first three recorded interviews, Weakley steadfastly denied any involvement in the crime.

32.     Then, on May 15, 2000, Bruce Cave had an off-the-record discussion with Weakley, during which Weakley changed his story to say he was present when Hash and Jason Kloby murdered Ms. Scroggins. Here again, while there are hours of recorded interviews, the first moment Weakley "confessed" his presence at the crime was not recorded.

33.     Last year, Weakley admitted that his account implicating Michael Hash was false and his entire story was based on information fed and pictures shown to him "during interviews with police and prosecutors." In a recent sworn statement, Weakley explained what happened during the unrecorded portions of his interviews with Jenkins and Mack:

> "Jenkins and Mack showed me everything you can imagine about the crime. They showed me awful crime scene photos. . . . Jenkins and Mack talked to me about a lot of the other details of the murder, such as the location where Ms. Scroggins' body had been found, the position it was in, and how she had died. . . . . I talked to Jenkins and Mack many other times. During these conversations, the investigators became extremely frustrated and told me what I was saying wasn't matching up with what they already knew. When I would answer questions in a way they didn't like, the investigators would suggest that I was lying or confused."

34.     Eventually, Weakley agreed to go along with Jenkins' and Mack's account implicating Michael Hash in the murder of Thelma Scroggins. Weakley recalled that Jenkins and Mack continued to coach him: "Once I finally said I had been there, Jenkins and Mack made me repeat the story back to them over and over again. They would keep repeating questions until I gave them an answer that satisfied them."

35.     According to a contemporaneous report prepared by Special Agent Carwile, shortly after Weakley agreed to testify falsely against Hash, "Weakley's attorney [entered] in negotiation with the Commonwealth's Attorney [Gary Close] to make a deal whereby Weakley would testify against Hash and Kloby."

**Hash Is Arrested and the Sham Investigation Continues**

36.     On May 16, 2000, the day after Weakley changed his story based on information fed to him by Jenkins and Mack, Michael Hash was arrested. There was no probable cause for the arrest; there was no physical evidence implicating Hash, Hash had no history of violence, and there was no credible motive attributed to Hash. Moreover, the theory of the crime on which the arrest was based – that three teenage boys, Hash, Jason Kloby, and Eric Weakley committed the crime together – was rejected by the former lead investigator on the matter, Lieutenant David Carter. Hash's arrest was based entirely on the manufactured, fabricated accounts of Shelton and Weakley.

37.     Jenkins, Mack, and Cave did not disclose the details of their dealings with Shelton or Weakley to other officials. In a deposition last year, Gary Close cited Weakley's fabricated account as support for Hash's arrest; according to Close, "you had Eric Weakley who knew things about that crime scene that no one else would know. The physical evidence matched what he said happened." As stated above, Weakley's knowledge of the crime scene was based on information fed to him by Jenkins and Mack.

38.     State Police Special Agent Carwile disagreed with the decision to arrest Hash. In sworn testimony last year, Agent Carwile summarized the state of the evidence at the time Hash was arrested: "I didn't believe anything that Eric Weakley said, and the Shelton girl failed the polygraph on issues that were very important to a very important investigation, so as far as I'm concerned, she wasn't reliable either." Carwile did not keep this view to himself. Carwile testified that, around the time of Hash's arrest, Carwile voiced his concerns about Weakley's credibility to "anyone who would listen." In particular, Carwile warned Gary Close that Weakley was entirely unreliable and "just saying things."

39.     Jenkins also knew there was no probable cause to arrest Hash. Jenkins has testified that

"both witnesses [Shelton and Weakley] lied numerous times in discussions with law enforcement officials," and that, "To this day, I do not believe the story they told – that three teenage boys murdered Thelma Scroggins – is plausible." As to Weakley specifically, Jenkins has testified he "repeatedly lied and gave different versions of the truth," and "Eric Weakley has no credibility with me because of telling so many different lies." Jenkins has admitted under oath that he believed Hash's arrest was not "proper" because the Sheriff's Office "had a very weak case."

40. Despite the lack of any credible evidence against him, Hash was arrested, charged with capital murder and confined to jail to await his trial.

41. Jenkins, Mack, and Gary Close then continued the sham investigation.

## Jenkins and Mack Attempt to Intimidate Hash's Alibi Witness, Billy Blithe

42. When Hash was arrested, Hash's schoolmate, Billy Blithe, made it known that Hash had been with him the day and the night Scroggins was murdered. Blithe's account provided a complete alibi for Hash.

43. Jenkins and Mack then went to visit Billy Blithe. According to a sworn statement provided by Blithe, on May 17, 2000, the day after Hash was arrested, Jenkins threatened to arrest Blithe if he did not change his story. Two days after that, Jenkins again threatened Blithe, telling Blithe that he would never see his unborn child if he did not change his story.

## Defendants Devise a Plan to Transfer Hash in Order
## to Put Him in a Cell Block With Paul Carter for One Night

44. After he was arrested on May 16, 2000, Hash was held for a week at the Culpeper Jail.

45. Defendants recognized they had no credible evidence against Hash and decided to create additional false evidence. They concocted a scheme to transfer Hash briefly to the Albemarle-Charlottesville Regional Jail (the "Albemarle Regional Jail") where Paul Carter, a well-known jailhouse snitch, was detained, in order to fabricate a story that Hash confessed the crime to Carter.

46.     In a sworn affidavit last year, former Sheriff Lee Hart recalled the decision to transfer

Hash:

> "Michael Hash, Jason Kloby, and Eric Weakley were arrested in
> approximately May 2000. Once Hash was arrested, one of the
> investigators approached me to propose that Hash be transferred from the
> Culpeper County Jail to a correctional facility in the Charlottesville area,
> and it was my understanding **the purpose was to obtain information by
> the informant from Hash**.
>
> I did not feel comfortable approving the proposed transfer. Instead, I told
> the investigator to seek authorization from Commonwealth's Attorney
> Gary Close before said transfer. It was my view that the
> Commonwealth's Attorney should authorize this transfer of Hash and
> further investigation of this matter. It was my understanding that Hash
> was transferred shortly after the investigator consulted with
> Commonwealth's Attorney Gary Close."

47.     Gary Close did approve the "further investigation" of the matter and Hash's transfer. As

a result, in an extremely unusual move, on May 24, 2000, eight days after he was arrested, Hash was

transferred to the Albemarle Regional Jail. He was there for only two nights, spending the second

night in a cell block with Paul Carter. Paul Carter would later falsely testify at Hash's trial that Hash

confessed to the Scroggins murder during the one night Carter and Hash shared a cell block.

48.     Paul Carter was a prolific government informant. Prior to testifying against Hash,

Carter provided information or testimony that implicated at least twenty people in at least three

different federal prosecutions. An Assistant U.S. Attorney described Carter's history as an informant

in this Court on July 3, 2000: Carter "made himself available . . . to anybody and everybody in the law

enforcement community when he felt he had some information that was helpful." That same Assistant

U.S. Attorney determined in July 2000 that Paul Carter should be separated in prison from at least

*eighteen* other inmates because of "his cooperation with the government."

49.     In May 2000, Paul Carter was in the Albemarle Regional Jail awaiting sentencing by

District Court Judge James Michael on his federal drug conviction. He had a singular mission during

this period; as he wrote his counsel on May 9, 2000, "I'm not still involve[d] with this crime life. I just find things out to cut my time down."

50.     Culpeper officials engaged in extraordinary machinations in order to put Hash in a cell block with Paul Carter. According to the Albemarle Regional Jail's electronic records, Hash is the only inmate transferred from the Culpeper Jail to the Albemarle Regional Jail in the last fifteen years. Chief Jailer Mary Dwyer, who worked in the Culpeper Jail for 31 years, testified that she cannot remember a single transfer from Culpeper to the Albemarle Regional Jail other than Hash.

51.     Hash's transfer to and movements within the Albemarle Regional Jail were highly irregular for other reasons:

   (a)   Hash was placed with Paul Carter in permanent housing, which was unusual for an inmate transferred from another jail and for only two days. Paul Carter's cell block was one of approximately twenty-four housing units at the Albemarle Regional Jail where Hash could have been held.

   (b)   Hash was booked into a cellblock far more quickly than was usual. According to an officer at the Albemarle Regional Jail, "I do not recall any other inmate being moved as quickly from booking into a cellblock."

   (c)   As a matter of safety, the Albemarle Regional Jail considered race and other characteristics when assigning inmates to cells. According to an officer at the Albemarle Regional Jail, Cellblock FI, the cellblock in which Hash was placed, generally housed black males; Albemarle Regional Jail records show that all eleven other inmates in the cell block where Hash spent one night were black. According to another Jail officer, "it was highly unusual to place a white teenager such as Hash in a permanent housing cellblock with all black males."

52.     In an attempt to legitimize the transfer, Defendant Mary Dwyer created a false report on May 24, 2000 stating that Hash was transferred to the Albemarle Regional Jail for "administrative reasons." She identified two purported reasons: (i) Hash had to be separated from Kloby and Weakley and (ii) his "court appointed attorney" was from Charlottesville. Dwyer would later admit in a deposition that moving Hash to be closer to his attorneys was not the "real reason" for the transfer and that explanation was provided because it "sounded good," and that her May 24, 2000 report may have

been created solely "because it looks pretty on paper."

53.     For years, Gary Close denied the true purpose of the transfer. But earlier this year, he finally admitted the real reason for the transfer: to put Hash in "a jail where there was a snitch."

54.     In connection with the federal habeas corpus petition, earlier this year the Commonwealth admitted in this Court the reason for Hash's transfer to the Albemarle Regional Jail: "We will, of course, first concede that Mr. Hash was moved to Charlottesville to be put in the presence of a snitch. That's indisputable, I think, at this point in the record."

**Culpeper Officials Meet With Carter to Provide Him With Details About the Crime**

55.     Prior to Carter's meeting Hash in the Albemarle Regional Jail, two Culpeper law enforcement officials met with Paul Carter. At that meeting, the Culpeper officials told Carter details about the Scroggins murder and the investigation. The details fed to Carter were not public knowledge.

56.     Hash spent the first night at the Albemarle Regional Jail, May 24, 2000, in the gymnasium. On May 25, he was moved to cell block FI, the cell block where Paul Carter and 10 other inmates were detained.

57.     Within minutes of Hash's arrival in cell block FI, Hash was approached by a man he would later learn was Carter. Carter asked Hash whether Hash was the individual who had been on the local news and Hash confirmed he was. Carter attempted to make additional conversation with Hash, but Hash said nothing to Carter about the crime he had been charged with or the related investigation. Hash did not confess any crime to Carter. And Carter did not learn any details about the murder of Thelma Scroggins as a result of his encounter with Hash. Carter would later testify that he learned details about the crime and investigation from Hash; in fact, he learned those details from Culpeper law enforcement officials.

**Close, Jenkins, and Mack Make a Deal with Paul Carter
in Exchange for His Fabricated Account of Hash's Confession**

58. Shortly after his brief encounter with Hash, Paul Carter wrote his attorneys that he was "trying hard and with good reason to cut [his] time down," that he had come across a big case, and "the person who did it is in my cell."

59. On June 26, 2000, Jenkins and Mack met with Paul Carter for approximately 35 minutes. After the meeting, Jenkins created a false report for the investigation file stating that Hash confessed the crime to Carter in the one night Hash and Carter shared a cell block. Jenkins recorded that Carter described details of the crime but Jenkins knew that Carter had been fed those details previously by Culpeper officials.

60. Carter also struck a deal with Jenkins, Mack, and Close: Carter would testify against Hash, and Jenkins, Mack, and/or Close would assist Carter with his federal sentence. Carter's plan was to file a motion for a sentence reduction pursuant to Federal Rule of Criminal Procedure 35(b) and have the Culpeper officials assist with that motion. Jenkins, Mack, and Close all agreed to assist.

61. Following the June 26, 2000 meeting with Jenkins and Mack and a conversation with Gary Close, Paul Carter described his arrangement with the Culpeper officials in numerous letters.

    (a)    On July 19, 2000, Carter wrote his lawyer: "I talk to Scott Jenkins from Culpeper and the Commonwealth Gary Close. They will use me for the Michael Hash Capital Murder case. They will help me in anyway to get me back in court for my Rule 35b. . . . Here are the numbers to both people. Det. Scott Jenkins - 540-727-3400 ComW Gary Close - 540-727-3444 Ext 103."

    (b)    On July 27, 2000, Carter wrote his lawyer: "I talked to Ms. Berry and told her about what I wanted to do about the Capital Murder Case in Culpeper. . . . I have done all the research about the Rule 35b and I have all the right to go back on this motion. . . . I talk to Scott Jenkins today and him and VA Commonwealth Gary Close is more than willing to come to support and talk at my 35b motion for a time cut."

    (c)    On August 8, 2000, Carter wrote his lawyer: "Michael Hash went to primary hearing today. They said that he was likely to plea out cause of my statement. If not I was [going] to be use at the trial. I would like you to keep in touch with

Scott Jenkins. . . . Scott Jenkins: 540-727-3400 Gary Close: 540-727-3444."

(d)     On August 13, 2000, Carter wrote Judge Michael, who had sentenced Carter earlier in the year: "Rule 35B say that I have a right to come back for a sentence reduction if some of the information I gave lead to arest or a guilty plea. The information is to a Capital Murder case in Culpeper County. I have talk to the DA of Culpeper Gary Close and the two lead detective in this case and they are willing to come to court for me to tell how my information help assist them in there case and help got there man for murder."

(e)     On October 3, 2000, Carter wrote his lawyer: "It is about whats going on with my motion 35b. I talk to Gary Close and Scott Jenkins and both are willing to go to court with me to speak on my behalf."

(f)     On October 20, 2000, Carter wrote his counsel: "In Culpeper they use my statements at the Grand Jury to take the Capital Murder case to the higher court. I really want to help them so that I can get as much as possible time off. I have some great information for them." Ex. 38 (emphasis added).

(g)     On October 26, 2000, Carter wrote Judge Michael: "I'm very sure that I will receive the motion for Rule 35b."

(h)     On November 7, 2000, Carter wrote Judge Michael: "The information that I gave for the Capital Murder case in Culpeper Co. The man gets to go to trial. I'm very sure that I would be granted the Rule 35b motion. . . . Scott Jenkins the police that heading the murder case said he would speak for me at my Rule 35b."

(i)     On November 8, 2000, Carter wrote the Probation Office in the Western District: "I talk to Gary Close the prosecutor of Culpeper Co and the police Scott Jenkins. I gave some key statements about the Capital Murder case on Michael Hash. They both are more than willing to talk on my behalf in court. I know that this is enough to file for the Rule 35b."

62.     Carter also wrote letters to Jenkins and Mack. Jenkins testified that he received two to three letters from Carter and that Mack received at least one letter from Carter. None of those letters was disclosed to Hash's trial counsel, however.

63.     Earlier this year, in connection with the federal habeas corpus petition proceedings in this Court, the Commonwealth conceded the existence of the agreement between Culpeper officials and Carter:

"We also agree that a promise or an agreement was made by Jenkins that he would in fact talk to the U.S. [A]ttorney on behalf of Carter, if in fact asked

14

by the U.S. [A]ttorney or Carter to do so. So I think it's clear that in fact there was a promise or agreement."

64.　　The agreement by Jenkins, Mack, and Close to assist Carter in connection with his federal sentence was never disclosed to Hash or his trial counsel and, in fact, was affirmatively concealed at Hash's trial.

**Jenkins Attempts to Procure Additional False Testimony from Tommy Lightfoot**

65.　　The month before Hash's trial, defendants apparently determined that the fabricated accounts of Shelton, Weakley, and Carter might not suffice to convict Hash. Accordingly, they continued their sham investigation to manufacture another fabricated account.

66.　　Tommy Lightfoot was incarcerated in the Culpeper County Jail in early 2001. Lightfoot spoke to Hash several times during this period.

67.　　In January 2001, Jenkins approached Lightfoot and told Lightfoot that Jenkins could assist with Lightfoot's sentence if Lightfoot testified that Hash confessed the crime to him. Hash had not confessed to Lightfoot and Lightfoot refused to provide the false testimony that Jenkins requested. When Lightfoot refused, Jenkins threatened to charge Lightfoot with additional crimes.

68.　　Notwithstanding Lightfoot's refusal to participate in Jenkins' fabrication, Jenkins created a false report for the investigation file stating that Lightfoot in fact said that Hash confessed the crime to him.

**Hash's Criminal Trial and Conviction**

69.　　Jason Kloby was tried for the capital murder of Thelma Scroggins first. The Commonwealth's evidence against Kloby consisted of the testimony of Alesia Shelton and Eric Weakley, who provided the same testimony they would later provide at Hash's trial. After a three-day trial, Kloby was acquitted on November 2, 2000.

70.　　Hash was tried by a jury in the Circuit Court for Culpeper County from February 5-9,

2001. Close was the lead prosecutor at trial and was assisted by his deputy, Paul Walther.

71.     Close described the witnesses in his opening statement. He told the jury that Weakley participated in the crime and was "interviewed extensively before any arrests were made." Close also previewed Paul Carter's testimony for the jury:

> "Now, you're also going to hear from Paul Carter. Now, Paul Carter
> didn't know any of these people. . . . he's going to testify that when he
> was in jail down in the Charlottesville area, Mike Hash was transferred
> down there and when he was down there he and Mike Hash talked and
> Mike Hash [confessed] that he and two other dudes had killed an old lady
> up in Culpeper."

72.     Scott Jenkins testified about the Sheriff's Office's investigation. He testified falsely on several issues:

(a)     He testified that no details concerning the crime were revealed to Eric Weakley during the investigation: "I didn't give him information about the crime scene." Jenkins emphasized this point; he testified he did not want to "give [Weakley] any pieces of the puzzle, so to speak, that he could put together and form some type of tale or story to – whether the accusing someone else or otherwise to feed it back to me." But that is exactly what Jenkins and Mack in fact had done.

(b)     He testified that all interviews of Eric Weakley were recorded.

(c)     He testified that he made it "clear" to Paul Carter that "there's nothing I can do to offer any form of deal or promise or payment for [Carter's] information, anything of that kind."

73.     Shelton testified falsely that she overheard Hash and Kloby discuss the crime. Not surprisingly, her testimony was full of contradictions. For example, she testified that she went camping with Hash, Kloby, and Weakley on a certain weekend, but records from the group home in Richmond reveal that Shelton was at the group home that weekend. She testified the murder weapon was a handgun with a clip but the Commonwealth's gun expert opined the murder weapon was a Winchester .22 rifle. Shelton testified that she spent the afternoon of the murder with Hash and Kloby at Hash's home, but a deputy testified at trial that he visited Kloby's home that same afternoon and Kloby was there, but Hash and Shelton were not.

74. Weakley testified falsely that he was present when Hash and Kloby committed the murder. Weakley now admits this was not true and all of his testimony about the crime was fed to him by Jenkins and Mack. Weakley also testified at trial that he had not been promised anything in exchange for his testimony and did not expect any benefit in exchange for his testimony when, in fact, he had a deal with Gary Close relating to his testimony.

75. Carter testified falsely that, in the one night they shared a cell block, Hash confessed that he committed the Scroggins murder. On cross-examination, Hash's trial counsel attempted to show that Carter was testifying in exchange for assistance with his federal sentence. But Carter denied it, testifying that he was expecting "Nothing . . . in return for . . . [his] testimony." Rather, Carter testified that his motivation for providing evidence against Hash was that the victim "could have been my grandmother, your grandmother or somebody else" and that he was generally concerned "[f]or older people." Going further, Carter testified that his understanding was that he was not even *eligible* for any benefit in exchange for his testimony against Hash because it was in state court and had no "impact on federal sentencing."

76. Nothing was done at trial to correct Carter's false testimony. In fact, his lies were embraced and buttressed by Gary Close. In his closing argument, Close told the jury that the Commonwealth made no deal for Carter's testimony. This was false. Close went a step further. Adopting Carter's testimony that he could not get a federal sentence reduction for testimony in state court, Close told the jury:

> "You know, Paul Carter, they want to suggest to you that somehow, really bothersome here, that somehow his sentencing in federal court, federal court, is connected to what's going on up here. This is a state court. That's totally different. Different prosecutors, different laws, different judges, everything is different, and I don't know what else to tell you. There's no deal with Mr. Carter. . . . Those are totally different issues."

77. Similarly, Close assured the jury that the Commonwealth had made no deal with

Weakley in exchange for his testimony.

78.     In his closing argument, Close also focused on the details of the crime purportedly known by Weakley and asked the jury, in light of those details, "Is there any doubt that Eric Weakley was there?"

79.     Based on, among other lies and omissions, the fabricated accounts of Shelton, Weakley, and Carter, and Close's false statements to the jury, Hash was convicted of capital murder and sentenced to life in prison without the possibility of parole.

**After Hash's Conviction, Eric Weakley Gets His Deal**

80.     As stated above, Eric Weakley testified at trial that there was no deal relating to his testimony and he did not expect any benefit, and Close assured the jury that Weakley had not been promised anything for his testimony. But less than two weeks after Hash was convicted, Weakley received his reward for testifying against Hash.

81.     Weakley was initially charged, like Jason Kloby and Michael Hash, with capital murder. His preliminary hearing on that charge was continued at least five times until after he testified against both Kloby and Hash. Then, less than two weeks after Hash was convicted, Close amended Weakley's charge to second degree murder and entered a plea agreement with Weakley, pursuant to which he was sentenced to six years and eight months imprisonment.

**Jenkins, Close, and Mack Make Good on Their Promise to Help Get Paul Carter Released**

82.     Shortly after Hash was convicted, Paul Carter received his reward for providing false testimony.

83.     On March 12, 2001, Jenkins wrote the following to Carter:

> "I've spoken with the Commonwealth Attorney and was told that we are not to give anything in writing on your behalf to the courts. But as I had told you before, if I'm ever asked by the U.S. Attorney in your case, I will tell him what you did concerning the Scroggins Homicide case.

After I received your letter last week, I called the [U.S. Attorney's Office]."

84.     The U.S. Attorney's Office then filed a Rule 35(b) motion, which Judge Michael heard in this Court on July 20, 2001. The only witness other than Carter himself was James Mack.

85.     In his sworn testimony at the Rule 35(b) hearing, Mack misrepresented to the Court the circumstances of Hash's encounter with Carter; Mack testified that the encounter was "Just coincidental. . . . it just happened." Mack also testified that Carter was "a substantial witness" to the prosecution of Hash and commended Carter "for stepping forward." Judge Michael granted the Rule 35(b) motion; Carter's sentence was reduced from 180 months to 60 months – approximately the amount of time Carter had served – and he was released from prison.

**Defendants Attempt to Cover Their Tracks**

86.     Following his conviction and the denial of his direct appeals, Hash filed a state habeas corpus petition, and, after the state petition was denied, a federal habeas corpus petition. Throughout the habeas corpus proceedings, Close, Mack, and Jenkins all sought to cover their tracks with respect to their intentional deprivation of Hash's constitutional rights.

87.     In connection with the state habeas corpus petition proceedings, Gary Close provided a sworn certification on August 24, 2005 stating he had "no knowledge of any expectations by" Paul Carter of any consideration in exchange for his testimony other than Close's understanding that Jenkins told Carter "nothing could be done in exchange for [Carter's] testimony." This was not true; Close knew that Carter expected assistance with his federal sentence in exchange for his testimony.

88.     In connection with the state habeas corpus petition proceedings, Jenkins and Mack also concealed their dealings with Paul Carter:

(a)     In a February 17, 2006 deposition, Scott Jenkins testified that the reason for Hash's two-night transfer to the Albemarle Regional Jail was that "the attorneys in Charlottesville, the defense attorneys for Hash wanted him closer to them for their conveniences working with a client. . . . [H]e was down there for the

19

purpose of being near his attorneys."

    (b)    In a February 17, 2006 deposition, James Mack testified that Hash was transferred to the Albemarle Regional Jail for "administrative reasons."

    (c)    At the October 16, 2007 evidentiary hearing in the Culpeper Circuit Court, Jenkins misrepresented his deal with Carter when Jenkins testified that Carter "was told we can't have anything to do with affecting . . . his case."

89.    Close's, Jenkins', and Mack's concealment of their dealings with Paul Carter continued in connection with the proceedings relating to the federal habeas corpus petition in this Court.

    (a)    Jenkins provided a sworn affidavit on September 13, 2010 stating that "Hash was transferred to the jail in Albemarle in May 2000 because his attorneys wanted him to be closer to their offices in Charlottesville."

    (b)    In an August 10, 2011 deposition, Jenkins again testified that Hash was transferred to the Albemarle Regional Jail "to be closer to his attorneys in Charlottesville."

    (c)    In an August 11, 2011 deposition, Mack testified that Hash was moved "because his attorney was from Charlottesville and so it made it easier for them." Mack also testified that Paul Carter asked for nothing in exchange for his assistance with the Hash prosecution.

    (d)    In an August 24, 2011 deposition, Gary Close testified falsely regarding Hash's transfer. According to Close, "defense counsel was from Charlottesville and they, you know, it was a long drive for them to come up to Culpeper and so it helped them somewhat to move him down closer -- help them somewhat to move him down closer." When asked how he learned of that explanation for the transfer, Close testified that he learned it from Hash's trial counsel.

90.    Also, Culpeper officials have never turned over the letters that, according to Jenkins, Paul Carter wrote to them. Gary Close also admits that a box of documents relating to Hash's case has "gone missing."

## District Court Judge Turk Grants Hash's Habeas Petition and Vacates His Conviction

91.    Hash filed a petition for writ of habeas corpus in this Court on April 15, 2010 and an amended petition on July 20, 2010. Judge Turk denied the Commonwealth's Motion to Dismiss on March 30, 2011 and authorized Hash to conduct discovery.

92.     In discovery, Hash served subpoenas for documents and took the depositions of Jenkins, Mack, Close, Carwile, Cave, and Dwyer. Hash also obtained affidavits from numerous individuals, including former Sheriff Lee Hart. Hash moved for summary judgment on November 14, 2011.

93.     On February 28, 2012, Judge Turk granted Hash's habeas petition and vacated Hash's conviction. In so doing, Judge Turk cited a "cavalcade of evidence . . . demonstrating police and prosecutorial misconduct," including:

(a)     "manufactured statements by Carter and Weakley";

(b)     contrary to prior explanations, "Close has [now] admitted that Hash was transferred to the Albemarle-Charlottesville Regional Jail to be put in contact with Carter, a known prison informant";

(c)     Jenkins made "a promise . . . to talk to the U.S. Attorney on behalf of Carter regarding his federal sentence. . . . [T]he Commonwealth failed to disclose the promise to Hash's trial counsel";

(d)     "Close's false statement [to the jury] that no promise had been made and his overall misleading suggestion that no such promise could in fact be made";

(e)     "letters written by Carter to Investigators Jenkins and Mack . . . were not disclosed to Hash's trial counsel";

(f)     "the Prosecution concealed negotiations with Weakley regarding a plea agreement in exchange for his testimony"; and

(g)     "the results of the polygraph examinations given to Weakley and Shelton were never produced to Hash's trial counsel."

94.     Judge Turk summarized the conduct of Defendant Gary Close as follows: "the Prosecutor's Office engaged in a series of lies and failures to disclose exculpatory evidence to Hash's trial counsel."

95.     Judge Turk summarized the conduct of Defendants Scott Jenkins and James Mack as follows: "the conduct of Investigators Jenkins and [Mack] . . . rises to the level of outrageous misconduct because the acts were intentional and not merely negligent."

96.     Judge Turk concluded that Hash's "conviction was brought about by methods that

offend a sense of justice" and represented "an extreme malfunction in the state criminal justice system." Judge Turk also concluded that Hash had proffered evidence sufficient to establish his actual innocence of the capital murder for which he was convicted.

97.     The Commonwealth did not appeal the Court's order granting Hash's petition.

## DAMAGES

98.     The acts and omissions of defendants, jointly and severally, deprived Michael Hash of his civil rights under the Fourth and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the Commonwealth of Virginia.

99.     As a direct and proximate cause of defendants' unlawful, intentional, reckless, and/or bad faith acts and omissions, Michael Hash was falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve 11 years and 9 months in jail and prison for a crime he did not commit.

100.     As a direct and proximate cause of defendants' unlawful, intentional, reckless, and/or bad faith acts and omissions, Michael Hash suffered and continues to suffer grievous permanent injury, severe distress, pain, anguish, embarrassment, loss of companionship, loss of job training and employment, and monetary damages for which he is entitled to compensatory relief in such amounts as the Court and jury find fair and reasonable as supported by the evidence.

101.     The defendants' acts with respect to Michael Hash were intentional, malicious, deliberate, reckless, in bad faith, wanton and/or cruel such as to justify an award of punitive damages in such amounts as the Court and jury find fair and reasonable as supported by the evidence.

## COUNT I

### 42 U.S.C. § 1983 Claim For False Arrest In Violation of the Fourth Amendment (Against Defendants Jenkins, Mack, and Cave)

102.     Hash realleges and incorporates by reference the allegations set forth in paragraphs 1

through 101 above and further alleges as follows.

103.    This is a claim for damages against Defendants Jenkins, Mack, and Cave for their false arrest of Hash in violation of his Fourth Amendment rights.

104.    Defendants Jenkins, Mack, and Cave knowingly and deliberately arrested Hash without probable cause. The fabricated accounts of Alesia Shelton and Eric Weakley were the purported "evidence" upon which Hash was arrested. Jenkins, Mack, and Cave knew these accounts were false, and concealed this information from other officials. Jenkins, Mack, and Cave also knew that the theory of the crime implicating Hash was not supported by the evidence and was not plausible. Defendant Jenkins has admitted under oath that he believed Hash's arrest was not "proper" because the Sheriff's Office "had a very weak case."

105.    In arresting Hash without probable cause, Defendants Jenkins, Mack, and Cave knowingly violated Hash's constitutional rights. The false arrest of Hash by Jenkins, Mack, and Cave led directly to Hash's imprisonment and the deprivation of his liberty. Hash's lengthy imprisonment was the reasonably foreseeable result of the conduct of Jenkins, Mack, and Cave.

106.    This Court vacated Hash's conviction earlier this year because the conviction was unconstitutional.

## COUNT II

### 42 U.S.C. § 1983 Claim For Fabrication of Evidence – Eric Weakley's Story Implicating Hash – In Violation of the Fourteenth Amendment's Guarantees of Due Process and Fair Trial (Against Defendants Jenkins and Mack)

107.    Hash realleges and incorporates by reference the allegations set forth in paragraphs 1 through 106 above and further alleges as follows.

108.    This is a claim for damages against Defendants Jenkins and Mack for their fabrication of Eric Weakley's story implicating Hash in the crime in violation of Hash's Fourteenth Amendment rights to due process and a fair trial, and his right not to be deprived of liberty as a result of the

23

fabrication of evidence by a government officer acting in an investigative capacity.

109.    Defendants Jenkins and Mack knowingly and deliberately provided details about the crime to Eric Weakley. Jenkins and Mack then knowingly and deliberately coached Eric Weakley into telling a fictitious story implicating Hash in the murder of Thelma Scroggins. Jenkins and Mack knew this fabrication of evidence was a violation of Hash's rights.

110.    Weakley's story implicating Hash was a key component of the evidence against Hash at trial. Commonwealth's Attorney Close emphasized Weakley's story in his opening statement and closing argument to the jury. And Weakley, as a trial witness, parroted much of the fabricated story that had been fed to him by Jenkins and Mack.

111.    The story fabricated by Defendants Jenkins and Mack led to Hash's wrongful conviction for capital murder and his incarceration after his conviction for more than eleven years. Hash's conviction and lengthy imprisonment were the reasonably foreseeable results of the fabrication.

## COUNT III

### 42 U.S.C. § 1983 Claim For Fabrication of Evidence – Paul Carter's Story Implicating Hash – In Violation of the Fourteenth Amendment's Guarantees of Due Process and Fair Trial (Against Defendants Close, Jenkins, and Mack)

112.    Hash realleges and incorporates by reference the allegations set forth in paragraphs 1 through 111 above and further alleges as follows.

113.    This is a claim for damages against Defendants Close, Jenkins, and Mack for fabrication of Paul Carter's story implicating Hash in the crime in violation of Hash's Fourteenth Amendment rights to due process and a fair trial, and his right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigative capacity.

114.    Defendants knew Paul Carter knew nothing about the crime and that Hash had not confessed the crime to Carter. Carter was fed details about the crime in order to enable Carter to tell a fictitious story that Hash confessed the crime to Carter. Jenkins, Mack, and Close knowingly and

deliberately procured Carter's false story by assuring him they would assist with his federal sentence. Defendants knew this fabrication of evidence was a violation of Hash's constitutional rights.

115.    Defendants knew Carter's story of Hash's confession was fabricated and procured but Carter's fabricated story was a key component of the evidence against Hash at trial.  Close emphasized Carter's story of Hash's false confession in his opening statement and closing argument to the jury. And Carter, as a trial witness, parroted the details about the crime that had been fed to him by Culpeper officials and testified falsely that he had learned those details from Hash.

116.    The story fabricated and procured by Defendants Jenkins, Mack, and Close led to Hash's wrongful conviction for capital murder and his incarceration for more than eleven years. Hash's conviction and lengthy imprisonment were the reasonably foreseeable results of defendants' conduct.

117.    Defendant Close's role in the fabrication and procuring of Paul Carter's account implicating Hash was not in Close's capacity as the Commonwealth's advocate in connection with Hash's trial, nor did it relate to Close's preparation for the initiation of judicial proceedings or for trial. Rather, Close's dealings with Carter were in furtherance of defendants' sham investigation.

## COUNT IV

### 42 U.S.C. § 1983 Claim For Pre-Conviction Suppression of Favorable Evidence In Violation of the Fourteenth Amendment's Guarantees of Due Process and Fair Trial (Against Defendants Jenkins and Mack)

118.    Hash realleges and incorporates by reference the allegations set forth in paragraphs 1 through 117 above and further alleges as follows.

119.    This is a claim for damages against Defendants Jenkins and Mack for their suppression of favorable evidence prior to Hash's conviction in violation of Hash's Fourteenth Amendment rights to due process and a fair trial.

120.    Defendants Jenkins and Mack knew that Eric Weakley knew nothing about the crime

other than the information fed to him by law enforcement officials. But Jenkins and Mack suppressed that fact as well as their other dealings with Weakley prior to trial. The truth about Weakley – that, in fact, he knew nothing about the crime – was favorable evidence to Hash. Had the truth been revealed prior to or at Hash's trial, Hash would not have been convicted.

121.    Defendants Jenkins and Mack knew that Hash was transferred to Paul Carter's cell block to enable Carter to provide false testimony against Hash. Jenkins and Mack also knew that they had agreed to assist Carter with his federal sentence in exchange for Carter's false testimony against Hash. But Jenkins and Mack suppressed these facts as well as their other dealings with Carter prior to trial. The truth about Paul Carter was favorable evidence to Hash. Had it been revealed prior to or at Hash's trial that (a) Hash was transferred for two nights simply to be exposed to Carter, (b) that Carter's testimony was false, or (c) that Carter was testifying in exchange for assistance with his federal sentence, Hash would not have been convicted.

122.    Defendants Jenkins and Mack also suppressed communications and dealings with Alesia Shelton, Billy Blithe, and Tommy Lightfoot, including those in which Jenkins and Mack (i) fed these witnesses nonpublic information, and/or (ii) attempted to coerce or persuade these witnesses to provide false information about Hash. These communications and dealings were favorable evidence to Hash.

123.    Defendants Jenkins and Mack knew their suppression of favorable evidence violated Hash's rights.

124.    Defendants Jenkins' and Mack's suppression of the truth about their dealings with witnesses and potential witnesses led to Hash's conviction and incarceration. Hash's conviction and lengthy incarceration were the reasonably foreseeable results of Jenkins' and Mack's suppression of favorable evidence.

## COUNT V

### 42 U.S.C. § 1983 Claim For Conspiracy to Violate Constitutional Rights
### (Against All Defendants)

125.    Hash realleges and incorporates by reference the allegations set forth in paragraphs 1 through 124 above and further alleges as follows.

126.    This is a claim for damages against all defendants for their participation in a conspiracy to violate Hash's constitutional rights to due process and a fair trial.

127.    The following overt acts, among others, were done knowingly and deliberately in furtherance of the conspiracy to deprive Hash of his liberty in violation of his constitutional rights:

    (a)    One or more defendants fed Alesia Shelton information about the crime to enable Shelton to tell a false story implicating Hash in the crime;

    (b)    Jenkins and Mack fed Eric Weakley information about the crime to enable Weakley to tell a false story implicating Hash in the crime;

    (c)    Jenkins, Mack, and Cave caused Hash to be arrested without probable cause;

    (d)    Jenkins, Mack and Close orchestrated Hash's transfer to the Albemarle Regional Jail under false pretenses to enable Paul Carter to tell a false story of Hash's confession;

    (e)    Mary Dwyer created and signed a document stating a false explanation for Hash's transfer to the Albemarle Regional Jail;

    (f)    One or more defendants fed Paul Carter information about the crime to enable Carter to tell a false story of Hash's confession;

    (g)    Jenkins created a document for the investigation describing Carter's story of Hash's confession, which Jenkins knew to be false;

    (h)    Carter adopted a statement implicating Hash that Carter knew to be false;

    (i)    Close suppressed favorable information relating to his deal with Weakley in exchange for Weakley's false testimony against Hash;

    (j)    Jenkins and Mack suppressed favorable information relating to their communications and dealings with Shelton, Billy Blithe, and Tommy Lightfoot; and

    (k)    Jenkins, Mack and Close suppressed favorable information relating to their

agreement to assist Carter with his federal sentence in exchange for Carter's false testimony against Hash.

128.     As a result of these and other overt acts done knowingly, deliberately and maliciously by the Defendants, Hash was denied his Fourteenth Amendment rights to due process and a fair trial and Hash was deprived of his liberty for over eleven years.  Hash's wrongful conviction and lengthy imprisonment were the reasonably foreseeable results of defendants' conspiracy.

129.     Defendant Close's conspiratorial acts were not taken in Close's capacity as the Commonwealth's advocate in connection with Hash's trial, nor did they relate to Close's preparation for the initiation of judicial proceedings or for trial.  Rather, Close's overt acts in furtherance of the conspiracy to violate Hash's constitutional rights were part of defendants' sham investigation.

### COUNT VI

**42 U.S.C. § 1983 Claim For Post-Conviction Suppression of Favorable Evidence**
**In Violation of the Fourteenth Amendment's Guarantee of Due Process**
**(Against Defendants Close, Jenkins, and Mack)**

130.     Hash realleges and incorporates by reference the allegations set forth in paragraphs 1 through 129 above and further alleges as follows.

131.     This is a claim for damages against Defendants Close, Jenkins, and Mack for their suppression of favorable evidence after Hash's conviction in violation of Hash's Fourteenth Amendment right to due process.

132.     Following Hash's conviction, Defendants Close, Jenkins, and Mack engaged in a knowing, deliberate, and malicious effort to suppress evidence favorable to Hash, including, among other things:

(a)     Mack testified falsely at Paul Carter's Rule 35(b) hearing in this Court on July 20, 2001 that Hash's meeting with Carter in the Albemarle Regional Jail was a coincidence.

(b)     Close provided a sworn certification on August 24, 2005 stating falsely he had "no knowledge of any expectations by" Paul Carter of any consideration in

exchange for his testimony other than Close's understanding that Scott Jenkins told Carter "nothing could be done in exchange for [Carter's] testimony."

(c) In a February 17, 2006 deposition in connection with the state habeas corpus petition proceedings, Jenkins testified falsely that the reason for Hash's two-night transfer to the Albemarle Regional Jail was that "the attorneys in Charlottesville, the defense attorneys for Hash wanted him closer to them for their conveniences working with a client. . . . [H]e was down there for the purpose of being near his attorneys."

(d) In a February 17, 2006 deposition in connection with the state habeas corpus petition proceedings, Mack testified falsely that Hash was transferred to the Albemarle Regional Jail for "administrative reasons."

(e) At the October 16, 2007 evidentiary hearing in the Culpeper Circuit Court, Jenkins misrepresented his deal with Carter when Jenkins testified that Carter "was told we can't have anything to do with affecting . . . his case."

(f) Jenkins provided a sworn affidavit on September 13, 2010 stating falsely that "Hash was transferred to the jail in Albemarle in May 2000 because his attorneys wanted him to be closer to their offices in Charlottesville."

(g) In an August 10, 2011 deposition, Jenkins again testified falsely that Hash was transferred to the Albemarle Regional Jail "to be closer to his attorneys in Charlottesville."

(h) In an August 11, 2011 deposition, Mack testified falsely that Hash was moved "because his attorney was from Charlottesville and so it made it easier for them." Mack also testified that Carter asked for nothing in exchange for his assistance with the Hash prosecution.

(i) In an August 24, 2011 deposition, Close testified falsely regarding Hash's transfer. According to Close, "defense counsel was from Charlottesville and they, you know, it was a long drive for them to come up to Culpeper and so it helped them somewhat to move him down closer -- help them somewhat to move him down closer." When asked how he learned of that explanation for the transfer, Close testified that he learned it from Hash's trial counsel.

(j) All three defendants have concealed other materials favorable to Hash, including communications with Carter.

133. Defendants Close, Jenkins, and Mack knew their concealment and suppression violated Hash's constitutional rights. The deliberate and continuing acts of concealment and suppression by Close, Jenkins, and Mack prolonged Hash's incarceration, which was the reasonably foreseeable result of their conduct.

134.    Defendant Close's post-conviction concealment and suppression of favorable evidence were not done in connection with Close's capacity as prosecutor or the Commonwealth's advocate, nor did those acts relate to Close's preparation for the initiation of judicial proceedings or for trial.

## COUNT VII

### Claim for Malicious Prosecution Under Virginia Law
### (Against Defendants Close, Jenkins, Mack, and Cave)

135.    Hash realleges and incorporates by reference the allegations set forth in paragraphs 1 through 134 above and further alleges as follows.

136.    This is a claim for damages under Virginia law against Defendants Close, Jenkins, Mack, and Cave for their malicious prosecution of Hash.

137.    Defendants Close, Jenkins, Mack, and Cave participated and cooperated in the institution of charges against and the prosecution of Hash. Hash was charged and prosecuted without any probable cause. The participation and cooperation of Close, Jenkins, Mack, and Cave in the institution of charges against and the prosecution of Hash were deliberate and malicious. On February 28, 2012, this Court granted Hash's petition for habeas corpus and vacated Hash's conviction.

## COUNT VIII

### Claim for False Imprisonment Under Virginia Law
### (Against Defendants Close, Jenkins, Mack, and Cave)

138.    Hash realleges and incorporates by reference the allegations set forth in paragraphs 1 through 137 above and further alleges as follows.

139.    This is a claim for damages under Virginia law against Defendants Close, Jenkins, Mack, and Cave for their false imprisonment of Hash.

140.    Defendants Close, Jenkins, Mack and Cave, each acting knowingly, deliberately, and in bad faith, and without adequate legal justification, engaged in an unlawful and unconstitutional process that resulted in the institution of charges against Hash and the prosecution and conviction of Hash. As

a direct result of the actions of Close, Jenkins, Mack, and Cave, Hash was restrained and confined to state and local correctional facilities for almost 12 years.

**WHEREFORE**, Michael Hash prays as follows:

A.    For a trial by jury;

B.    That the Court award compensatory damages to him and against the defendants, jointly and severally, in such amounts as the Court and jury find fair and reasonably supported by the evidence;

C.    That the Court award punitive damages to him, and against the defendants, jointly and severally, in such amounts as the Court and jury find fair and reasonably supported by the evidence and that will deter such conduct by defendants in the future;

D.    For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.    For any and all other relief to which he may be entitled.

Respectfully Submitted,

By:

HUNTON & WILLIAMS LLP
Matthew P. Bosher (VSB # 75894)
mbosher@hunton.com
Johnathon E. Schronce (VSB #80903)
jschronce@hunton.com
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

*Attorneys for Plaintiff Michael Hash*

December 28, 2012