# Exhibit A

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 2 8 2012

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Roanoke Division

| | | |
|---|---|---|
| MICHAEL WAYNE HASH, | ) | |
| | ) | Civil Case No. 7:10-cv-00161 |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| GENE M. JOHNSON, | ) | |
| DIRECTOR OF VIRGINIA | ) | **By: James C. Turk** |
| DEPARTMENT OF CORRECTIONS, | ) | **Senior United States District Judge** |
| | ) | |
| *Respondent*. | ) | |

This matter comes before the Court on Petitioner Michael Wayne Hash's ("Hash" or "Petitioner") petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has moved to dismiss. Hash alleges that he has been imprisoned in violation of his right to due process because the Prosecution and the Culpeper authorities concealed their arrangement with prosecution witness Paul Carter ("Carter"), and more generally, engaged in a pattern of non-disclosure and deception during the prosecution of Hash's case. Hash further alleges that his trial counsel rendered constitutionally ineffective assistance of counsel by failing to investigate Carter and failing to present an alternate theory of the crime at trial. For the reasons stated herein, Hash's request for habeas relief with respect to each of his claims is **GRANTED**.

## I.   Background and Procedural History[1]

The history of this case is extensive. Because the analysis turns on specific statements made during trial and testimony from the state and federal habeas proceedings, the Court begins

---

[1] Although this Court ultimately concludes that the Virginia Supreme Court's legal conclusions were incorrect, the Virginia Supreme Court carefully reviewed the record and this Court has borrowed heavily from its cogent fact section. See Hash v. Dir. of the Dep't of Corrs., 686 S.E.2d 208, 209-12 (Va. 2009).

1

with a higher level overview of the case.  More specific details and verbatim statements are reserved for presentation in the appropriate analysis sections.  See infra Sections III and IV.

### A.  Procedural History

On February 9, 2001, a jury convicted Hash of capital murder of Thelma B. Scroggins ("Scroggins").  Petitioner was sentenced to life imprisonment without the possibility of parole. At the time of Scroggins' murder in July 1996, Hash was fifteen years old.  Hash was not charged with the murder until 2000, when he was nineteen years old.  Prior to Hash's trial, Hash's co-defendant, Jason Kloby ("Kloby"), was tried and acquitted of Scroggins' murder.

Hash appealed his conviction in the Circuit Court of Culpeper County ("Culpeper Circuit Court") to the Court of Appeals of Virginia, which affirmed the trial court's judgment in an unpublished opinion.  Hash v. Commonwealth, No. 1290-01-4, 2002 WL 2004853 (Va. Ct. App. Sept. 3, 2002).  The Supreme Court of Virginia denied Hash's petition for appeal and petition for rehearing.

Thereafter, Hash filed a petition for habeas corpus in the Culpeper Circuit Court.  In that petition he alleged, inter alia, that the Prosecution and the Culpeper authorities had violated his rights by (1) failing to disclose records of correspondence or discussions with Carter about Carter's expectation of a sentence reduction in exchange for his testimony against Hash; (2) failing to disclose records of Carter's history as an informant; (3) using Carter's testimony when the Commonwealth knew or should have known that such testimony was perjured; (4) suggesting to the jury that Carter could not reduce his federal sentence by assisting prosecutors in a state court case; and (5) failing to disclose deals with Weakley regarding his testimony in Hash's case and his expectation of leniency.  Hash also alleged that his trial counsel were constitutionally deficient for (1) failing to investigate evidence of other suspects in the case, (2)

2

failing to discover letters written by Carter to a federal district court judge and others seeking assistance in obtaining a sentence reduction in his federal case, and (3) failing to present evidence that Hash was moved from Culpeper to the Albemarle-Charlottesville Regional Jail in order to expose Hash to Carter.

In its unpublished letter opinion, the Culpeper Circuit Court denied all of Hash's claims. First, the Culpeper Circuit Court held that although trial counsel's performance was deficient with regard to counsel's failure to investigate Carter, Hash had failed to prove prejudice under Strickland v. Washington, 466 U.S. 668 (1984). (State Habeas Cir. Ct. Op. at 14, 16). Second, the Culpeper Circuit Court found that Petitioner had not proven prejudice with regard to his trial counsel's failure to present evidence that Hash was relocated from Culpeper to the Albemarle-Charlottesville Regional Jail for the purpose of being exposed to known prison informant, Carter. (Id. at 16). Third, with regard to Hash's trial counsel's failure to present an alternate theory of the crime, the Culpeper Circuit Court held that the investigation conducted by Hash's trial counsel was reasonable and their resulting trial strategy was reasonable. (Id. at 18-19). Finally, the Culpeper Circuit Court held that there was insufficient proof of misconduct with regard to the Commonwealth's dealings with Carter. (Id. at 18).[2]

Hash appealed the Culpeper Circuit Court's judgment to the Supreme Court of Virginia. The Supreme Court of Virginia's review was limited to the following assignments of error:[3]

> 1. The circuit court erred in denying habeas relief on Claim A regarding "snitch" testimony from Paul Carter and ruling that, although counsel's performance was constitutionally deficient, there was no reasonable probability of a different result.

---

[2] The Culpeper Circuit Court's decision also included rulings on issues not raised in the federal habeas proceedings and not considered by this Court.

[3] Hash's Petition for Appeal included several more assignments of error not granted by the Virginia Supreme Court.

3

> 2. The court erred in failing to grant habeas relief specifically on
> Claim A(4), when the prosecution used the perjured testimony
> of Paul Carter.

Hash, 686 S.E.2d at 212.  As to both assignments of error, the Supreme Court of Virginia denied

Hash's petition and affirmed the Culpeper Circuit Court.  Specifically, the Supreme Court of

Virginia held that Hash had "not met the burden of showing a reasonable probability that, but for

counsel's error in failing to investigate the federal file and use the letters to further impeach

Carter, the trial would have had a different result."  Id. at 216.  Regarding the second assignment

of error, the Supreme Court of Virginia held that because Hash failed to present any evidence of

a "pre-arranged agreement with the federal prosecutor to make a Rule 35(b) motion … Hash has

failed to establish that Carter's testimony was false" and, consequently, "there can be no way to

establish that the prosecution knew of any alleged falsity."  Id. at 217.

On April 15, 2010, Hash timely filed a federal petition for writ of habeas corpus before

this Court, pursuant to 28 U.S.C. § 2254.  On July 2, 2010, Hash filed an amended petition.  The

claims set forth in Petitioner's amended petition are as follows:

> Claim IA:  Petitioner's trial counsel rendered constitutionally
> ineffective assistance of counsel when they failed to investigate
> and impeach the Commonwealth's key witness, Paul Carter, a
> jailhouse snitch;
>
> Claim IB:  Petitioner's trial counsel rendered constitutionally
> ineffective assistance of counsel when they failed to present
> evidence rebutting the Commonwealth's multi-perpetrator theory
> of the case and evidence incriminating an alternative suspect;
>
> Claim IIA:  The Commonwealth violated Petitioner's due process
> rights by concealing offers of favorable treatment to multiple
> prosecution witnesses; and
>
> Claim IIB:  The Commonwealth violated Petitioner's due process
> rights through the Culpeper Sheriff's Department's improper and
> offensive investigation.

4

(Dkt. No. 12-2).  Subsequently, the Court granted Petitioner's unopposed motion for ballistics

testing, (Dkt. No. 28), and granted Petitioner's oral motion for further discovery, (Dkt. No. 34).

Both parties filed dispositive motions and the Court heard argument on January 24, 2012.  Prior

to oral argument, Petitioner advised the Court that Respondent had conceded Hash's ability to

show cause and prejudice with regard to Claim IIA.  (Dkt. No. 53).

### B.  Hash's Criminal Trial

At trial, Hash was represented by court appointed counsel, Richard Davis ("Davis") and

Michael T. Hemenway ("Hemenway").  Hash was arrested in May 2000, nearly four years after

Scroggins' July 1996 murder.  The first deputy assigned to investigate the case, Investigator

David Carter ("Investigator Carter"), concluded that a single assailant had committed the crime,

based on the crime scene evidence.  (State Habeas H. Tr. at 250, 255).  One of the suspects

developed was Billy Scott ("Scott"), but the case went cold.  (Id. at 258).  In November 1999, a

new Sheriff was elected and he revisited the case.  (Jenkins Aff. at ¶ 6).  Investigator Scott

Jenkins ("Investigator Jenkins") and Investigator James Mack ("Investigator Mack") were the

new deputies assigned to the case.  They were responsible for developing Hash as a suspect.

During trial the Prosecution presented evidence that Scroggins was found dead in her

home, having suffered four gunshot wounds to the head.  Three of the four shots were to the left

side of Scroggins' head and one was to the back of her head.  Investigator Jenkins testified that

the only DNA found at the scene belonged to the victim and that although five fingerprints were

recovered, no match was ever made.  Further, no firearm was recovered at the crime scene that

matched the .22 caliber bullets recovered from Scroggins' body.

The Prosecution had no physical evidence connecting Hash to the Scroggins murder.  As

a result, the Prosecution relied on the testimony of three key witnesses to prove their case: "an

5

eyewitness," Eric Weakley ("Weakley"); Hash's cousin, Alesia Shelton ("Shelton"); and Carter, a known prison informant, to whom Hash had allegedly confessed the crime.

Weakley testified that he, Kloby, and Hash attacked Scroggins and that Hash shot Scroggins "[t]wice in the side of the head ... [t]he left side." (Trial Tr. at 595). Weakley also stated that Kloby shot her in approximately the same place and then fired the last shot in the back of her head. (Id. at 596-97).

Shelton testified that on the night Scroggins was murdered she overheard Hash and Kloby at Hash's house talking about Scroggins and how "they were going to do it tonight" and that Hash said "they should make her suffer." (Id. at 542). Shelton also testified that she saw "the blue car from [Hash's] house" parked near Scroggins' house. (Id. at 544). Finally, Shelton testified that on a later occasion she, Kloby, and Hash rode their bicycles to a church near Scroggins' house and at that time Kloby told her how he and Hash had entered Scroggins' house and shot her. (Id. at 808-09). Shelton stated that when Kloby said this she looked at Hash and he "nodded his head and said yes-yeah." (Id. at 810).

Carter testified that while he was incarcerated in the Albemarle-Charlottesville Regional Jail Hash was "the only white dude in our cell block." (Id. at 726). Carter stated that Hash confessed to the murder, saying he "shot the lady twice," used a .22 caliber gun, and that he "got away in a vehicle, her truck or whatever she had, the vehicle ...." (Id. at 727-28). Carter further testified that Hash said he had committed the murder with two other individuals and that his cousin "was trying to tell on him what happened about the whole case and everything." (Id. at 728). Regarding the timing of Hash's confession, Carter stated that Hash confessed to him in "April, May, around that area" of 2000. (Id. at 730). The evidence showed that on May 24,

2000, Hash was transferred to the Albemarle-Charlottesville Regional Jail and that Carter first contacted Investigators Jenkins and Mack on June 26, 2000.

On cross-examination Hash's trial counsel elicited inconsistencies in Carter's statement regarding the number of times Hash had shot Scroggins. However, when asked if he had assisted government on prior occasions, Carter testified that he had only done so on one prior occasion. (Id. at 736). Carter was not impeached on this point; despite the fact that had Hash's trial counsel investigated they would have found evidence that Carter was a prolific informant.[4] Regarding his testimony at Hash's trial, Carter stated that although he had asked the Commonwealth's Investigators, to whom he had spoken about Hash's confession, to speak to the U.S. Attorney on his behalf, the Investigators "didn't talk to him." (Id. at 734). When asked if the purpose of his conversation with the Investigators was to potentially reduce his sentence, Carter responded "Somewhat, yes...." (Id. at 737). Nevertheless, on re-direct the Prosecutor was able to rehabilitate Carter's testimony with Carter's answer that it was his understanding that his testimony in the state court proceedings against Hash did not have any impact on his federal sentence. (Id. at 740). On re-cross, Hash's counsel continued unsuccessfully to impeach Carter's testimony. When asked whether a substantial assistance or Rule 35(b) motion simply required "helping the prosecutor with the case," Carter answered "Yeah, that's a federal case. It don't say nothing about state case." (Id. at 741).

The Prosecution's case also relied on Hash's statements to the police and his own testimony at trial. Specifically, Hash stated that in the beginning to middle part of 1995 he

---

[4] Evidence indicates that Carter provided information or testimony that implicated at least twenty people in at least three different federal prosecutions. (Carter Sentencing Hear. Tr. at 5-7); (Carter State Habeas Dep. Tr. at 19-23); (Carter Sentencing Hear. Tr. at 7) (An Assistant U.S. Attorney stated Carter "made himself available … to anybody and everybody in the law enforcement community when he felt he had some information that was helpful."). Indeed, during this general time period Carter wrote: "I'm not still involve[d] with this crime life. I just find things out to cut my time down." (Carter 5/8/00 Letter to O. Ware).

7

talked with Kloby and Weakley about robbing someone in the area. (Id. at 1153). Hash explained that Kloby and Weakley wanted to rob somebody who would not put up much of a fight. (Id. at 1153). On cross-examination Hash admitted that he had "assumed" Kloby and Weakley were talking about an old lady. (Id. at 1153). Hash also testified that Kloby mentioned the robbery a second time in a telephone conversation, and a final time "several months down the road to a year later in the mall." (Id. at 1154). Hash denied any participation in the murder and testified that he had told Kloby he did not "want to have anything to do with it." (Id.). At no point during the police interrogation or during his trial did Hash admit to planning to murder anyone.

Hash's defense at trial included testimony by 18 witnesses. Hash's counsel emphasized the contradictory nature of Shelton's and Weakley's testimony and Hash testified in his own defense. When asked if he shoot or had anything to do with Scroggins' murder Hash answered "Absolutely not." (Id. at 1132). When asked "at any time did you make a statement or an admission to this Mr. Paul Carter that you shot Mrs. Scroggins or killed her of anything like that?" Hash answered "No, sir." (Id. at 1141).

Hash's counsel also put forward an alibi defense, supported by the testimony of several witnesses. Hash testified he was at the home of his best friend, William Blithe III ("Billy"), at the time of the Scroggins' murder. (Id. at 1130). However, Hash also testified that he had initially told police that he was with Beverly Rosenfeld, his girlfriend around the time of the Scroggins murder. (Id. at 1136). Hash explained that he had told police that he was with Rosenfeld because when first asked "that was the best I could recollect of where I was during that period of that summer." (Id. at 1143). He further explained that he had told investigators about being at Billy's house "the second time the investigators talked to [him]" but that was

8

"maybe three, three to four weeks after I was first interviewed" and after he had spoken with Billy. (Id. at 1149-50). Hash's testimony was corroborated by the testimony of his parents (Id. at 843-44, 846-48, 1072, 1074-75).

Hash's trial counsel called William L. Blithe, Billy's father, and Sieglinde Blithe, Billy's mother, to corroborate Hash's alibi. Billy Blithe was called as a rebuttal witness for the Prosecution. Each testified that Hash was at their home in Mitchell, Virginia, helping Billy fix a broken lawn tractor. (Id. at 872, 879-880). William Blithe was cross-examined as to his ability to recall details of the weekend. (Id. at 876-77). Sieglinde Blithe was also cross-examined as to her ability to recall details of the weekend and as to her ability to recall that particular weekend out of the many her son and Hash had spent together. (Id. at 882-84, 885). Billy Blithe, when questioned by the Prosecution, testified that he initially could not recall if he and Hash had worked on the tractor on the weekend of the 13th or the 17th of July. (Id. at 1217). On cross-examination, however, he testified that Hash was at his house the weekend of the Scroggins murder. (Id. at 1222).

## C. Hash's State Habeas Proceedings

In his state habeas proceedings Hash raised prosecutorial misconduct claims and several ineffective assistance of counsel claims. After allowing Petitioner to conduct some discovery, the Culpeper Circuit Court held an evidentiary hearing on October 16 and 17, 2007. A significant question at this hearing was the relative importance and credibility of Carter's testimony against Hash. Both parties stipulated to Hash's exhibits, which included copies of the letters that Carter had written to Judge Michael, a federal district court judge, and other individuals concerning Carter's sentence reduction. In total, Carter wrote 25 letters to Judge Michael and others, all concerning his "35(b) motion" to have his federal sentence reduced in

9

light of his testimony in Hash's trial.  Five of those letters were written before Carter testified at Hash's February 2001 trial.

Investigators Jenkins and Mack testified at the hearing.  When asked if Carter had asked for a sentence reduction in exchange for his testimony against Hash, Investigator Jenkins stated that Carter "wanted us to speak with the prosecutor handling his case to speak on his behalf" but that Carter "was told we can't have anything to do with affecting his – his case that he was facing." (State Habeas H. Tr. at 37).  Investigator Jenkins also testified that he was initially skeptical of Carter's testimony, but became less skeptical when he learned Carter's statement referenced the same caliber weapon as the weapon in the Scroggins murder. (Id. at 42).  However, when questioned about the exact contents of Carter's statement, the evidence showed Carter stated that the murder weapon was a .22 caliber handgun, when in fact the ballistics expert concluded the weapon was most likely a .22 caliber rifle.  (Trial Tr. at 44).

Investigator Mack's testimony went to the relative importance of Carter's testimony.  In response to questions about the testimony he gave at Carter's Rule 35(b) hearing, Investigator Mack stated that Carter was a "substantial witness" and agreed that once Carter became a witness it "change[d] the way he looked at the case."  (State Habeas H. Tr. at 73-74).  Investigator Mack further stated that the case was "iffy" with just Shelton and Weakley as witnesses.  (Id.).  The transcript of the Rule 35(b) hearing, admitted as an exhibit during the evidentiary hearing, showed that Carter was originally sentenced to 180 months, although he initially faced the possibility of a maximum sentence of life in prison.  (Carter 35(b) H. Tr. at 18).  The transcript further showed that Judge Michael granted the Rule 35(b) motion and Carter's sentence was reduced to 60 months, (Id. at 20), which was approximately the amount of time Carter had served, (Id. at 13).

10

Hash's trial counsel also testified at the hearing. Hemenway was responsible for the investigation of Carter. He testified that he had information about Carter before trial, including the fact that Carter was "a big drug dealer and that he had cooperated before and that he had reduced his sentence based on that cooperation." (State Habeas H. Tr. at 214). Hemenway admitted that he did not obtain Carter's federal file prior to Hash's case, despite it being a "good idea" to do so, and that the letters in the file were "potentially useful." (Id. at 178-79). However, Hemenway did not believe that in cross-examining Carter he needed to use the letters, because Carter talked freely about his § 5K.1.1 motion and his Rule 35(b) substantial assistance motion and Carter "certainly didn't deny it that he had reduced his sentence." (Id. at 215). Davis also testified about the importance of the letters in Carter's federal file. Davis stated that he was aware that Hash was involved in a federal drug case. He also stated that "[l]ooking at [Carter's] file you could learn some things perhaps" and admitted that having Carter's letters would have been "very helpful." (Id. at 105).

Nonetheless, Davis did not believe Carter's testimony was the only important evidence in the Commonwealth's case, but his opinion as to the most important evidence in the case vacillated. Davis explained that the reason he discounted the testimony of Carter was because its "too easy to lie and, you know, maybe that just comes from my perspective as a lawyer who deals with people like that." (Id. at 149). Davis stated that "the biggest piece that we thought that was different from our case and Kloby's case was not Mr. Carter but Mr. Hash's statement." (Id. at 137). Specifically, Davis expressed concern about Hash's statement to the police because it involved "[p]lanning with the other two young men to go out and rob old people." (Id.). Davis also testified, somewhat contradicting his prior testimony, that Weakley was the "biggest" witness "because Weakley [was] the one that says I was there and I saw this happen and I saw

11

who did what." (Id. at 142). Hemenway testified that he didn't "think [the Commonwealth] had a particularly strong case" and that the case "was ratified with having Mr. Carter come forward." (Id. at 139).

### D. New Evidence Uncovered During Federal Habeas Proceeding

This Court allowed Hash's counsel to conduct additional discovery during the federal habeas proceedings. The new evidence is summarized below.[5]

#### 1. Carter's Expectations Regarding his Testimony in the Hash Case

Hash has presented evidence that Carter testified falsely at trial when he stated that he expected "nothing" in exchange for his testimony. Commonwealth's Attorney Gary Close ("Commonwealth's Attorney Close") now concedes that this statement was not truthful. (Close Dep. Tr. at 102). See also Va. Sup. Ct. Oral Arg. Tr. at 27-28. Commonwealth's Attorney Close also concedes that the statement he made in closing argument regarding whether there was a deal for Carter's testimony was misleading because, although he did not know at the time, Carter's federal sentence was connected to his testimony against Hash. (Close Dep. Tr. at 119-20). Furthermore, Investigator Jenkins has admitted there was a deal with Carter for his testimony prior to Hash's trial. At the State Habeas hearing in October 2007, Investigator Jenkins testified that "[Paul Carter] was told we can't have anything to do with affecting his ... case." (State Habeas H. Tr. at 37). In his federal deposition, Investigator Jenkins reviewed the letter he wrote to Carter, which states, "if I'm ever asked by the U.S. Attorney in your case, I will tell him what you did" and testified that "sounds like what I would have said." (Jenkins 3/12/01 letter to Carter); (Jenkins Dep. Tr. at 140). Also, when shown Carter's statement that "Scott Jenkins has

---

[5] The Court recognizes that some aspects of the evidence presented in this section were partially developed in the state habeas proceedings.

12

agreed to talk to the prosecutor if asked for my sake, Jenkins said, "I don't think that would have been a lie. I think that could have been said, yes." (Jenkins Dep. Tr. at 145).

### 2. Hash's Transfer to the Albemarle-Charlottesville Regional Jail was Orchestrated

Prior to the federal habeas proceedings, Culpeper authorities denied any suggestion that Hash was transferred to the Albemarle-Charlottesville Regional Jail to put him in contact with known prison informant, Carter. The evidence shows that Hash was in the Regional Jail for only two nights and spent the second night in a cell block with Carter. (Shifflett Aff. at ¶ 5, 11). Sheriff Lee Hart ("Sheriff Hart") admitted in his affidavit in connection with these proceedings that Hash was "transferred from the Culpeper County jail to a correctional facility in the Charlottesville area … and it was [his] understanding the purpose was to obtain information by the informant from Hash." (Hart Aff. at ¶ 5). Sheriff Hart further stated that he was not comfortable authorizing the transfer and told the investigator to "seek authorization from Commonwealth's Attorney Gary Close before said transfer." (Hart Aff. at ¶ 6). Subsequently, after reviewing Sheriff Hart's affidavit, Commonwealth's Attorney Close has admitted that Hash was transferred for the purpose of exposing him to the known informant, Carter. (Close Errata) ("At some point in time, I assume prior to the transfer, I had a conversation with Bruce Cave wherein he told me that the Sheriff's Office was thinking about moving Hash to a jail where there was a snitch.").

### 3. The Prosecution Failed to Disclose the Deal with Weakley for His Testimony

The Prosecution failed to disclose a deal with Weakley made for his testimony against Hash. A Virginia State Police report filed by Agent Wayne Carwile ("Agent Carwile") on June 15, 2000, indicates that "Eric Weakley's attorney has been in negotiation with the Commonwealth's Attorney to make a deal whereby Weakley would testify against Hash and

Kloby." (Carwile 6/15/00 Report at 2). However, this information was not disclosed until July 28, 2011.

### 4. *Weakley Has Recanted His Statements Implicating Hash*

Weakley's sworn affidavit states that he has no personal knowledge of the murder of Scroggins and no reason to believe Hash had anything to do with it. (Weakley Aff. at ¶ 2 ). Further, Weakley states that all the details of the Scroggins murder were provided to him by the Culpeper authorities. (Weakley Aff. at ¶ 5). In his federal deposition, Investigator Mack testified that he and Investigator Jenkins "may have" shown Eric Weakley pictures from the crime scene. (Mack Dep. Tr. at 69.) Moreover, Investigator Jenkins has now stated that he did not want to arrest Hash based on Shelton and Weakley's statements because "both witnesses lied numerous times in discussions with law enforcement officials.... To this day, I do not believe the story they told – that three teenage boys murdered Thelma Scroggins – is plausible." (Jenkins Aff. at ¶ 6).

### 5. *The Prosecution Failed to Disclose Weakley and Shelton's Polygraph Results*

Both Weakley and Shelton failed polygraph examinations regarding their statements implicating Hash. These exams were not disclosed to Hash. Commonwealth's Attorney Close admits Weakley's results were exculpatory. (Close Dep. Tr. at 30). According to Agent Carwile, a certified polygraph examiner, Shelton's test results showed that she was deceptive on every single question asked about her statement implicating Hash. Agent Carwile commented that "anybody that failed the examination to this extent wouldn't be a very credible witness in my opinion." (Carwile Dep. Tr. at 55). Investigator Mack said that in light of Shelton's failed polygraph, it would have been appropriate to "re-evaluate everything [she] ever said." (Mack Dep. Tr. at 51).

14

## II.  Standards of Review

### A.  Summary Judgment Standard

Summary judgment may be granted only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). More than an opposing narrative is required to defeat a motion for summary judgment because "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). An otherwise "properly supported motion for summary judgment" will not be defeated by the existence of merely any factual dispute, no matter how minor; rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). To withstand a summary judgment motion, the non-moving party must produce competent evidence sufficient to reveal the existence of a genuine issue of material fact for trial. Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002). Neither conclusory allegations nor the production of a "mere scintilla of evidence" in support of a non-moving party's case suffices to forestall summary judgment. Id. In cases where "the result is obvious," based on the pleadings, summary judgment should be granted. Bostick v. Stevenson, 589 F.3d 160, 165 (4th Cir. 2009).

### B.  AEDPA's Deferential Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief is available only if a petitioner's conviction was obtained "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Specifically, the writ may not be granted "with respect to any claim that was adjudicated on the merits" in state court unless the

state court adjudication (1) "resulted in a decision that was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).[6]

The Supreme Court has explained that "contrary to" and "unreasonable application" have different meanings in the context of § 2254. A state court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts" the governing federal law as set forth by the Supreme Court's cases, Williams v. Taylor, 529 U.S. 362, 404-5 (2000), or if the state court "decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts," Bell v. Cone, 535 U.S. 685, 694 (2002). Whereas, a state court decision is an "unreasonable application" of federal law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case … or is unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." Conaway v. Polk, 453 F.3d 567, 581 (4th Cir. 2006). See also Lockyer v. Andrade, 538 U.S. 63, 76 (2003) ("Section 2254(d)(1) permits a federal court to grant habeas relief based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced.").

A federal district court sitting in review of a state court judgment must afford the state court determination deference. See 28 U.S.C. § 2254(d). The Supreme Court had explained that § 2254(d) contains a "highly deferential standard for evaluating state-court rulings" that "demands that state-court decisions be given the benefit of the doubt." Woodford v. Visciotti,

---

[6] Because Petitioner does not argue the state court made an "unreasonable determination of the facts," the Court does not enumerate the specifics of that standard herein.

16

537 U.S. 19, 24 (2002) (per curiam) (internal quotation marks omitted). Indeed, in the case of an "unreasonable application" the Supreme Court has explained that because an "application must be 'objectively unreasonable'" before a court may grant habeas relief, "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings.'" Renico v. Lett, 130 S. Ct. 1855, 1862 (2010); Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (noting "unreasonable application" is not synonymous with error because "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold").

### C. Statute of Limitations

Under 28 U.S.C. § 2244(d), a petitioner has one year to file his petition for a writ of habeas corpus. Claims filed after that date, in amended petitions are barred unless they relate back to the claims in the original petition. Gray v. Branker, 529 F.3d 220, 241 (4th Cir. 2008). Claims are deemed to relate back if the claims "are tied to a common core of operative facts." Mayle v. Felix, 545 U.S. 644, 664 (2005). However, "[a]n amended habeas petition ... does not relate back ... when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Id. at 650.

### D. Evidence Properly Considered on Federal Habeas Review

The U.S. Supreme Court's decision in Cullen v. Pinholster addresses the circumstances under which a federal district court may consider evidence not presented to the state habeas court. 131 S. Ct. 1388, 1398 (2011) (stating the Court granted certiorari to resolve "whether review under § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal habeas court"). Pinholster's holding limits review under § 2254(d)(1) "to the record that was before the state court that adjudicated the claim on the merits" because the language of the statute is "backward-looking" and "requires an examination of the state-court

17

decision at the time it was made." 131 S. Ct. at 1398. See also Elmore v. Ozmint, 661 F.3d 783, 850 (4th Cir. 2011) ("[O]ur § 2254(d)(1) review is generally confined to the record that was before the state [] court.").[7]

Nonetheless, there are circumstances under which a petitioner is allowed to present new evidence in federal court. First, if the claim was not adjudicated on the merits, a federal court assesses the claim de novo. Pinholster, 131 S. Ct. at 1401 (limiting Court's reasoning to claims under § 2254(d)); Monroe v. Angelone, 323 F.3d 286, 297 (4th Cir. 2003) ("[W]here a state court has not considered a properly preserved claim on its merits, a federal court must assess the claim de novo."). Furthermore, if the district court finds that the state court applied the wrong law or unreasonably applied federal law, the district court may consider the full record when evaluating the petitioner's constitutional claims. Pinholster, 131 S. Ct. at 1401. However, in determining whether the wrong law was applied or an unreasonable application of federal law took place, the federal district court is limited to the evidence before the state habeas court. Pinholster, 131 S.Ct. at 1400 ("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review."); Jackson v. Kelly, 650 F.3d 477, 492 (4th Cir. 2011) ("In other words, when a habeas petitioner's claim has been adjudicated on the merits in state court, a federal court is precluded from supplementing the record with facts adduced for the first time at a federal evidentiary hearing.").

Second, if a petitioner is attempting to show cause and prejudice or actual innocence to excuse procedural default, the district court must consider all the evidence before it in determining whether the applicable standard has been satisfied. House v. Bell, 547 U.S. 518,

---

[7] Presentation and review of new evidence is disfavored because federal courts reviewing state habeas decisions were not intended to be "an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." Williams v. Taylor, 529 U.S. 420, 437 (2000).

537-38 (2006). Once cause and prejudice or actual innocence is shown, the court reviews the

claim de novo. Williams, 529 U.S. at 433.

Finally, Petitioner argues that Pinholster left open the possibility that new evidence,

which comes to light during federal proceedings, can transform a claim previously adjudicated

on the merits by the state court to such an extent that it is no longer fair to say the state court

reached the merits.[8]  To support this assertion, Petitioner relies on Justice Sotomayor's dissent in

which she poses the following hypothetical and states that under such circumstances the new

evidence should be considered:

> Consider, for example, a petitioner who diligently attempted in
> state court to develop the factual basis of a claim that prosecutors
> withheld exculpatory witness statements in violation of Brady v.
> Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The
> state court denied relief on the ground that the withheld evidence
> then known did not rise to the level of materiality required under
> Brady.  Before the time for filing a federal habeas petition has
> expired, however, a state court orders the State to disclose
> additional documents the petitioner had timely requested under the
> State's public records Act. The disclosed documents reveal that the
> State withheld other exculpatory witness statements, but state law
> would not permit the petitioner to present the new evidence in a
> successive petition.

Pinholster, 131 S. Ct. at 1417-18 (Sotomayor, J., dissenting).  Petitioner argues that although this

hypothetical is found in the dissent, the majority's opinion does not preclude its application.  See

Pinholster 131 S. Ct. at 1401, 1401 n.10 ("[S]tate prisoners may sometimes submit new evidence

in federal court.").  Indeed, quite to the contrary, the majority acknowledges the possibility of an

exception, but reserves the issue of what factual circumstances are necessary to trigger it for a

---

[8] Respondent cites two cases in support of the argument that Pinholster does not allow consideration of new
evidence for transformed claims; however, neither case reached the Pinholster transformed claim exception. Stokley
v. Ryan, 659 F.3d 802, 807 (9th Cir. 2011) ("We need not determine whether Pinholster bars the consideration of
Stokley's new evidence...."); Teleguz v. Kelly, No. 7:10-cv-00254, 2011 WL 3319885, at *8 (W.D. Va. Aug. 1,
2011) ("Wherever the line between § 2254(d) reviewable claims and those potentially meriting broader review, this
is a distinction that need not be made here.").

19

future holding. See Pinholster 131 S. Ct. at 1401 n.10 ("Justice Sotomayor's hypothetical involving new evidence of withheld exculpatory witness statements ... may well present a new claim.").

While the Court believes this exception is sensible because nothing in the majority's reasoning suggests that it intended to limit a diligent petitioner's ability to present evidence that stemmed from the State's failure to disclose potentially exculpatory material this Court need not address the question because its rulings herein do not depend on this exception for new claims. James v. Schriro, 659 F.3d 855, 876 (9th Cir. 2011) ("Pinholster acknowledged that a habeas petitioner who raises a claim that was not adjudicated on the merits in state court, and is therefore not subject to § 2254(d), may present new evidence in federal court....") (citing Pinholster, 131 S.Ct. at 1401).[9]

**E. Exhaustion**

Generally, a federal court may only grant habeas relief for exhausted claims – that is those claims that have been presented in state court before raising them in federal court O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); Vinson v. True, 436 F.3d 412, 417 (4th Cir. 2006). Claims not presented are generally procedurally defaulted. Wolfe v. Johnson, 565 F.3d 140, 160 (4th Cir. 2009). To be exhausted the legal claim need not be articulated or framed in

---

[9] This Court also notes that the Fourth Circuit has stated "[i]f the record ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d)." Winston v. Kelly, 592 F.3d 535, 555-56 (4th Cir. 2010). This is true because while "[e]xhaustion requires that the state courts have an opportunity to apply the law and consider all the evidence relevant to the petitioner's claim[,] [w]hen a state court refuses to opine on the merits of a claim properly presented to it, exhaustion is satisfied." Id. at 555 (internal citations omitted). While it is true that Winston was decided before Pinholster, and that in Jackson v. Kelly, 650 F.3d 477 (4th Cir. 2011), decided after Pinholster, the Fourth Circuit reversed a district court's grant of habeas corpus after an evidentiary hearing was held, the Fourth Circuit never addressed the Pinholster exception. In Jackson the Fourth Circuit reversed the grant of habeas because it found that the Virginia Supreme Court's application of Strickland was not objectively unreasonable as the "new" mitigation evidence petitioner introduced in the federal evidentiary hearing, was cumulative. 650 F.3d at 494-95.

state court in the same way as it is in the federal petition. Picard v. Conner, 404 U.S. 270, 277-78 (1971) (noting exhaustion requires that "the substance of a federal habeas corpus claim [is] first presented to the state courts" and that substance may be the same "despite variations in the legal theory or factual allegations urged" in support of the claim); Jones v. Sussex I State Prison, 591 F.3d 707, 713-14 (4th Cir. 2010) (claim exhausted where petitioner cites a case and fact pattern in support of his claim in state court); Lenz v. Washington, 444 F.3d 295, 302 (4th Cir. 2006) (courts should not "allow any semantic confusion to bar all federal review of petitioner's constitutional claims").

However, a petitioner may present procedurally defaulted claims in federal court if the petitioner can establish "cause and prejudice" for his or her failure to exhaust a claim or that his or her confinement constitutes a "miscarriage of justice." Wolfe, 565 F.3d at 160. A petitioner can show cause by demonstrating "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule ... [including] that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." Murray v. Carrier, 477 U.S. 478, 488 (1986) (internal quotation marks and citations omitted). To make a showing of prejudice the petitioner must demonstrate that the complained of conduct caused real harm to the petitioner. See Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977).

A petitioner demonstrates a "miscarriage of justice," through "[a] proper showing of actual innocence." Wolfe, 565 F.3d at 160 (citing House, 547 U.S. at 536-37). A petitioner is "actually innocent" if "it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence." Schlup v. Delo, 513 U.S. 298, 327 (1995).[10] The

---

[10] "[A] § 2254 petitioner is entitled to have a Schlup actual innocence issue addressed and disposed of in the district court." Wolfe, 565 F.3d at 164 (citing Bousley v. United States, 523 U.S. 614, 623 (1998)).

purpose of the actual innocence exception is "to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." Id. at 324. Indeed, this exception to procedural default reflects society's "fundamental value determination … that it is far worse to convict an innocent man than to let a guilty man go free." In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J., concurring). Because this standard "focus[es] the inquiry on actual innocence…the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on 'actual innocence' allows the reviewing tribunal to consider the probative force of relevant evidence that was either excluded of unavailable at trial." Schlup, 513 U.S. at 327-28. Finally, a "petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict." Id. at 331. [11]

### III. Procedural Bars: Exhaustion and Timeliness

Before addressing the merits of each claim, the Court must address the exhaustion and timeliness arguments made by the parties. The Respondent argues that Claims IB and IIB have not been fully exhausted and that Claim IIB is not timely. (Dkt. No. 45 at ¶¶ 8, 11, 12).[12] Petitioner argues, in that alternative, that the claims are appropriately exhausted and timely or that Petitioner's evidence, including the new evidence from this proceeding, satisfies the actual innocence exception to procedural default. The Court considers both arguments and finds that

---

[11] Although satisfying this standard "requires a substantial showing" the Supreme Court was careful to state that this standard is not so high as the "standard that governs review of claims of insufficient evidence … which focuses on whether any rational juror could have convicted" and "looks to whether there is sufficient evidence which, if credited, could support the conviction." Schlup, 513 U.S. at 330.

[12] Although Respondent initially argued that Claim IIA was not fully exhausted, (Dkt. No. 45 at ¶ 9), Respondent has now conceded that Hash can "show cause and prejudice such that any procedural default relating to that Claim is excused, and that, accordingly, the Court should review the Claim de novo," (Dkt. No. 53).

22

Petitioner's Claim IB is fully exhausted and Claim IIB is partially exhausted and partially timely. Additionally, Petitioner has satisfied the actual innocence exception to procedural default.

## A. Actual Innocence

Hash argues that he satisfies Schlup's actual innocence exception to procedural default based on an evaluation of all the evidence before this Court. In particular, Petitioner points to the evidence of (1) widespread police and prosecutorial misconduct, including the fact that Shelton and Weakley's failed polygraphs were not disclosed to Hash's trial counsel, (2) Weakley's recantation of his trial testimony against Hash, and (3) the evidence that Scott committed the crime. (Dkt. No. 49 at 28). Under Schlup, a showing of actual innocence requires "new reliable evidence ... that was not presented at trial" sufficient such that "it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence." 513 U.S. at 324, 327. Furthermore, "Schlup makes plain that the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." House, 547 U.S. at 538 (citing Schlup, 513 U.S. at 327-28 quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L.Rev. 142, 160 (1970)).

First, Hash has provided significant evidence of the extent of the police and prosecutorial misconduct that took place during the investigation and prosecution of his case. Specifically, Hash has come forward with evidence showing (1) he was transferred to the Albemarle-Charlottesville Regional Jail to be exposed to a known prison informant, Carter, which runs counter to the explanation offered throughout the state habeas proceedings;[13] (2) Investigator Jenkins promised to speak to the U.S. Attorney's office regarding how Carter's testimony was

---

[13] See infra Section IV.B.1.

23

beneficial in the Hash case, and to speak at a 35(b) hearing if requested to do so, but the Culpeper authorities denied the existence of any such agreement;[14] (3) Carter was allowed to testify falsely at Hash's trial that he expected no benefit from his testimony;[15] (4) Letters written by Carter to the Culpeper officials were never produced to Hash's trial counsel; (5) reports of polygraph examinations given to Weakley and Shelton were never produced to Hash's trial counsel;[16] (6) the Prosecution concealed negotiations with Weakley regarding a plea agreement in exchange for his testimony;[17] (7) Culpeper investigators provided Weakley with access to crime scene information and guided his answers to the investigator's questions; (8) Investigator Jenkins testified falsely at Hash's trial regarding whether Weakley's interviews were recorded;[18] (9) Investigator Carter saw a weapon matching the caliber weapon used to murder Scroggins at the home of another suspect, Scott, but failed to take custody of the weapon and run a ballistics report.[19]

Indeed, Respondent has generally admitted that "[t]here are a number of improprieties in this case ... no question about it." (Fed. Dist. Ct. H. at 30). Furthermore, Respondent has not challenged Hash's evidence of police and prosecutorial misconduct on the basis of its reliability. At least one other district court has found that evidence of police and prosecutorial misconduct is a basis upon which a petitioner can satisfy the actual innocence standard. See Lisker v. Knowles, 463 F. Supp. 2d 1008 (C.D. Cal. 2006), abrogated by Lee v. Lampert, 610 F.3d 1125

---

[14] Id.

[15] Id.

[16] See infra Section IV.B.2.

[17] Id.

[18] Id.

[19] Id.

24

(9th Cir. 2010). In <u>Lisker</u>, the court found the actual innocence exception to procedural default was established where:

> [1] a jailhouse informant to whom Petitioner supposedly confessed offered similar testimony in other cases, had access to information about Petitioner's case which was a potential source of a manufactured confession … recounted facts in conflict with the evidence, and appeared to have had undocumented prior contacts with police in Petitioner's case; [2] a likely suspect with a violent criminal record gave very suspicious statements to police soon after the murder but was investigated no further …; and [3] missteps in the investigation likely tainted the original jury verdict as suggested by various facts including that the detective in charge of the case threw away, or at least did not preserve, key evidence and made misstatements to state authorities about the case years later.

463 F. Supp.2d at 1042. Like <u>Lisker</u>, Hash's case presents evidence of (1) manufactured statements by Carter and Weakley, which also contradicted the crime scene evidence; (2) undisclosed communications between the police and Carter and Weakley; and (3) a failure to seize and test a rifle found at the house Scott lived in at the time of the murder that matched the caliber and type of weapon used to kill Scroggins.

Second, Weakley has now recanted his testimony against Hash, stating that "I have never been to Ms. Scroggins' house, and I had nothing to do with her murder. I also have no reason to believe that Michael Hash had anything to do with her murder." (Weakley Aff. at ¶ 2). Furthermore, Weakley now attests that the testimony he gave "at trial about the crime scene was given to me during interviews with police and prosecutors." (Weakley Aff. at ¶ 5). Specifically, Weakley stated that during his interviews "the investigators became extremely frustrated and told me what I was saying wasn't matching up with what they already knew. When I would answer questions in a way they didn't like, the investigators would suggest that I was lying or confused." (Weakley Aff. at ¶ 6).

25

Respondent challenges the reliability of Weakley's recantation arguing that recantations are "looked upon with the utmost suspicion, <u>United States v. Johnson</u>, 487 F.2d 1278, 1279 (4th Cir. 1973) (internal quotations and citations omitted), and that the facts in the present case are distinguishable from those in <u>House v. Bell</u>, 547 U.S. 518 (2006). (Dkt. No. 51 at ¶ 46, Dkt. No. 45, at ¶¶ 94, 98, 99 ). While the Court acknowledges that recantations are inherently suspicious, that does not mean they are never credible. In Hash's case, the Court finds there is sufficient evidence that corroborates Weakley's recantation to render it credible. Specifically, during a May 11, 2000, interview of Weakley, Investigator Jenkins asked Weakley "where did [Kloby and Hash] tell you that they shot [Scroggins]?" and Weakley answered "Once in the head and once in the chest." (Weakley Interview 5/11/00 at 50). It was not until Investigator Jenkins asked the same question approximately five more times, admonishing Weakley by stating "we can't have you add anything into it" and "I don't want you to add to that something, whether it be the chest, the toe or anything else" that Weakley altered his story and said "They shot her in the head," (Weakley Interview 5/11/00 at 51-53). This matches Weakley's sworn statement that the Investigators often became frustrated with him and coached him when he was not giving the "correct" answers. (Weakley Aff. at ¶ 6). Second, Investigator Jenkins has attested to the fact that he believes Weakley "lied numerous times in discussions with law enforcement officials in Culpeper County" and has stated that "[t]o this day, I do not believe the story [Weakley and Shelton] told – that three teenage boys murdered Thelma Scroggins – is plausible." (Jenkins Aff. at ¶ 6). Independent corroboration is provided by the fact that Weakley failed his polygraph examination. He was found to be deceptive when asked if Kloby and Hash told him they had shot Scroggins. (Weakley Polygraph at 2). Additionally, during the polygraph, "Weakley

26

admitted that the statement he provided to police that Mike [Hash] and Jason [Kloby] told him that they shot Thelma Scroggins was not true." (Id.).[20]

Indeed, Hash's case shares a number of similarities with Wolfe, where a habeas petitioner successfully meet the Schlup standard based on the recantation of his co-conspirator who testified against the petitioner at trial. No. 2:05-cv-432, slip op. at 7 (E.D. Va. Feb 4, 2010).[21] In Wolfe, the co-conspirator's recantation was corroborated by other affidavits, but the co-conspirator had since recanted his recantation. In light of these troubling circumstances the district court looked to the fact that (1)"[u]nlike most recantations, [the co-conspirator] does not escape liability or improve his own situation by his recantation," (2) "[the co-conspirator]'s affidavit also ha[d] considerable corroboration" in the form of other consistent affidavits, and (3) this was "not a case with voluminous direct evidence." Id. at 7-9.  Despite the fact that the co-conspirator subsequently rescinded his recantation, the court nonetheless found that the initial recantation "[w]as enough to raise doubt in a reasonable juror's mind" as to whether the petitioner committed the murder. Id. at 10.

Hash's case, if anything, is stronger than Wolfe. Weakley, like the co-conspirator does not stand to gain from his recantation and Weakley's affidavit is corroborated by the contemporaneous transcript of one of Weakley's interviews, Investigator Jenkins' affidavit, and by Weakley's polygraph failure. Furthermore, in Hash's case, as in Wolfe, there is no physical

---

[20] Petitioner also puts forward the statement by Investigator Mack that he or Investigator Jenkins "may have" shown Weakley crime scene photographs, as additional corroboration of Weakley's recantation. (Mack Dep. Tr. at 69). The Court has considered this evidence but does not find it as persuasive as the other cited evidence because it is partially contradicted by Investigator Jenkins' statement that while Weakley may have been shown crime scene photographs they "wouldn't show any thing that could provide details of the crime that are not known by that person or the persons that weren't involved." (Jenkins Dep. Tr. at 78).

[21] Wolfe was before the Eastern District of Virginia pursuant to a remand by the Fourth Circuit for the express purpose of considering petitioner's Schlup claim.

27

evidence linking Hash to the crime scene. Finally, Weakley has not recanted his recantation, in contrast to the co-conspirator whose recantation was nonetheless found sufficient in Wolfe.

Third, Hash has come forward with significant evidence that another suspect, Scott, may have committed the crime. At trial, although no weapon was recovered at the crime scene, the Commonwealth's firearm examiner was able to determine that the weapon used to kill Scroggins was most likely .22 rifle and possibly a .22 Winchester rifle. (Trial Tr. at 474, 476). Scott, who lived near Scroggins at the time of her murder, was an initial suspect in the case. (State Habeas H. Tr. at 188). A man matching Scott's description was seen the day after Scroggins' murder in the same area as Scroggins' truck was ultimately found. (Id. at 232). In July 1999, Investigator Carter visited the home Scott lived in at the time of Scroggins' murder and was shown a Winchester .22 rifle, but Investigator Carter did not take possession of the rifle and it was not tested until the current federal proceedings. (Id. at 243). As part of the federal proceedings, the Winchester .22 rifle that Investigator Carter had seen in 1999 was tested by DFS. DFS concluded that "due to the time between events, lack of sufficient dissimilarities, it was not possible to definitively eliminate" the Winchester .22 rifle as the rifle that fired the bullets found at the crime scene. (Dkt. No. 29 at 2).

In House v. Bell, the Supreme Court found the actual innocence exception to procedural default was established where evidence that the victim's husband, and not the petitioner, had committed the crime was not pursued or presented to the jury. 547 U.S. 518 (2006). The Supreme Court noted that although the evidence pointing to the husband was "by no means conclusive," it nonetheless "satisfied the gateway standard set forth in Schlup." House, 547 U.S. at 552, 555. Likewise, although the evidence in Hash's case is far from sufficient to "conclusively" determine that Scott murdered Scroggins, the Schlup standard does not require it

28

be so. Schlup is satisfied when the new evidence weighed against all the evidence is enough to create doubt in the mind of a reasonable juror.

Accordingly, the Court finds that this is one of those rare cases where the petitioner has satisfied the actual innocence exception to procedural default because Hash has "present[ed] evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error...." Schlup, 513 U.S. at 316. The combination of prosecutorial and police misconduct, largely conceded or unchallenged by the Respondent; Weakley's corroborated recantation; and the evidence that another suspect, Scott, may have actually committed the murder, when weighed against the fact that the Commonwealth's lack of physical evidence linking Hash to the crime and the contradictory and unreliable statements of Carter, Weakley, and Shelton, it is clear Hash has satisfied Schlup's actual innocence standard.

### B. Claim IB:  Failure to Present an Alternate Theory of the Crime

Respondent argues that Petitioner's claim is procedurally barred insofar as he seeks to present evidence that his trial counsel "fail[ed] to investigate the crime scene," (Dkt. No. 45 at ¶ 8), and "were ineffective for not presenting the single perpetrator claim" (Dkt. No. 51 at ¶ 3). However, Respondent concedes that "to the extent Hash is again arguing that his counsel failed to present evidence that other persons committed the murder, his claim is exhausted." (Dkt. No. 45 at ¶ 8). Petitioner argues that all aspects of this ineffective assistance of counsel claim were presented and therefore the claim is properly before this Court. (Dkt. No. 49 at 14-15). The Court agrees with Petitioner and finds that all aspects of Claim IB are exhausted.

In Hash's Petition for Appeal of the Culpeper Circuit Court's denial of his state Habeas Petition to the Virginia Supreme Court ("Petition for Appeal") Hash detailed the failure of his trial counsel to present an alternate theory of the crime. (Petition for Appeal at 28) ("At no time

29

was any other theory ever presented to the jury so the jury had only one choice."). This failure included both the failure to present the crime scene evidence directly and the failure to present testimony by Investigator Carter, the investigator responsible for processing the crime scene. Specifically, Hash stated:

> [A]ll the forensic evidence ... points to a single perpetrator. It is impossible for three people to go up and down the hall in the Scroggins' home without disturbing any of the blood drops on the floor or without knowing anything over. There is no way that Weakley and Petitioner picked up Scroggins and dragged her down to that back bedroom. There is no indication, within all of the dust and dirt on the floor of that residence, that three good sized men stomped around in that house. There is no way that Weakley ran from room to room in that residence, especially when the doors to the other rooms were still latched shut, with no footprints in those rooms....

(Petition for Appeal at 26-7) (emphasis omitted). Further, Hash described the failure of his trial counsel to present the testimony of Investigator Carter, who concluded that based on the "crime scene ... he has no doubt that there was only one person who committed the crime" because Hash's trial counsel "simply failed to see its significance." (Petition for Appeal at 27-8).

Furthermore, Hash's arguments in his Petition for Appeal flow directly from the Culpeper Circuit Court's denial of this claim. In discussing the evidence presented at the evidentiary hearing, the Culpeper Circuit Court noted Investigator Carter's opinion that "two, three or more individuals in Mrs. Scroggins' house at the time of the murder would have left more marks than were found." (State Habeas Cir. Ct. Op. at 11). The Culpeper Circuit Court then denied the claim, holding "that the attorneys for petitioner made a reasonable investigation into the evidence related to the other persons of interest and thereafter made a reasonable decision" with regard to their trial strategy. (State Habeas Cir. Ct. Op. at 19).

30

Under <u>Picard</u> a legal claim need not be articulated in exactly the same manner before the state courts as before the federal courts. Indeed, the exhaustion inquiry only seeks to determine "whether, on the record and argument before it, the … Court had a fair opportunity to consider … [the] claim and to correct that asserted constitutional defect…." 404 U.S. at 276. Here, both the Culpeper Circuit Court and the Virginia Supreme Court were presented with a more than sufficient opportunity to rule on the merits of Petitioner's claim, regarding trial counsel's failure to present an alternate theory of the crime. That argument is the same argument that Petitioner now requests this Court to consider: that trial counsel should have presented an alternate theory of the crime supported by the available evidence that the crime was committed by a single perpetrator and evidence of who that single perpetrator might have been. Respondent's request that this Court view Petitioner's argument regarding the presentation of an alternate theory of the crime as multiple separate arguments – presentation of other suspects, presentation of crime scene evidence, and presentation of the single perpetrator theory – only some of which are exhausted strains logic and does not comport with <u>Picard</u>'s "fair presentation" standard.

## C. Claim IIB: Investigation Violated Hash's Due Process Rights

Respondent raises both exhaustion and timeliness as procedural bars to this Court's authority to consider the merits of the claim.

### 1. Exhaustion

Respondent argues that Hash never presented the claim that the Culpeper County Sheriff's office was guilty of misconduct to the Virginia Supreme Court because it was not included in Hash's "assignments of error" pled before the Virginia Supreme Court. (Dkt. No. 45 at ¶ 11). Petitioner responds that the claim is properly before this Court because Hash "cited a fact pattern and cases in his state papers sufficient to exhaust the claim." (Dkt. No. 49 at 23). In support of this argument, Petitioner references the allegations of misconduct contained in his

31

brief to the Virginia Supreme Court and Respondent's response to those allegations. (Dkt. No. 45-5 at 37-38 and Dkt. No. 45-6 at 27). The Court agrees with Petitioner that Claim IIB is exhausted, with the exception of the facts relating to Tommy Lightfoot ("Lightfoot").

As an initial matter, the Court notes that the Fourth Circuit has rejected the argument that a claim must be included in a petitioner's assignments of errors to be exhausted. Jones, 591 F.3d at 714 (describing this argument as a "technical argument" and declining to find a claim is not exhausted simply because it is not presented in an assignment of error).

Petitioner's brief to the Virginia Supreme Court included the following allegations: "The Sheriff's Office had a file on Paul Carter that has since disappeared. The investigators had a habit of feeding and prodding witnesses such as Weakley and Shelton. The highly suspicious transfer of Petitioner was the result of additional governmental activity." (Dkt. No. 45-5 at 38). Respondent commented on these allegations: "The petitioner argues that prosecutorial misconduct was shown by the movement of Hash to the Charlottesville jail where he encountered Carter." (Dkt. No. 46-6 at 27). Accordingly, these facts indicate that Hash's claims of misconduct insofar as they relate to Hash's transfer to the Albemarle-Charlottesville Regional Jail and improper conduct in relation to witnesses Carter, Weakley, and Shelton have been properly exhausted. Furthermore, concerns about the handling of the investigation under Investigator Carter were brought to light during the evidentiary hearing at which Investigator Carter testified, ruled on by the Culpeper Circuit Court, discussed in Petitioner's Virginia Supreme Court Petition for Appeal, and mentioned in Petitioner's brief before the Virginia Supreme Court.[22]

---

[22] The Virginia Supreme Court Petition for Appeal, commenting on the investigation of other suspects completed by Investigator Carter stated: "But the most startling revelation of all was the Model 63 Winchester Rifle. It was known that this could very well be the murder weapon, but it was never seized or tested." (Petition for Appeal at 30-31) (internal citations omitted). Furthermore, in his brief before the Virginia Supreme Court, Petitioner stated "The

32

However, Lightfoot is discussed substantively for the first time in the amended petition, which Petitioner concedes. (Dkt. No. 49 at 24) ("The factual bases relating to each aspect of the claim were set forth in Hash's Original Petition, other than the facts relating to Tommy Lightfoot.")[23] Accordingly, the Court finds that although the allegations of misconduct are nearly identical as to those regarding Weakley and Shelton, because Lightfoot did not testify at trial and was never substantively discussed in the state habeas proceedings, the Petitioner has not exhausted his state remedies with regard to misconduct concerning Lightfoot.

### 2. Timeliness

Respondent argues that even if this claim is exhausted it is not properly before this Court because it is not timely as any "claim of police misconduct is completely unrelated to any of the original claims." (Dkt. No. 45 at ¶ 13). Respondent specifically challenges the claim to the extent it is directed at Lightfoot, Scott, and the interrogation of Weakley and Shelton. (Id. at ¶ 16). Petitioner argues that the claim is timely because under the standard set forth in Mayle v. Felix, 545 U.S. 644 (2005), the claim relates back to Hash's original federal habeas petition. Under Mayle an amendment relates back so long as there is a "common core of operative facts." 545 U.S. at 659. The Court agrees with Petitioner that Claim IIB is timely, with the exception of the aspects of the claim that relate to Lightfoot.

Hash's original petition sets forth facts regarding the investigation of Scott, (Dkt. No. 1, at ¶¶ 22-23), how the newly elected Sheriff started the investigation over from the beginning with less experienced personnel, (Id. at ¶¶ 24-26), the investigators' conduct during Shelton's

---

police developed numerous suspects, but no arrests were made at the time. (See generally Pet. Exh. 1, 4-27)." (Dkt. No. 45-5 at 5).

[23] Lightfoot is mentioned in Hash's brief before the Virginia Supreme Court, but there is no substantive discussion. (Dkt. No. 45-5 at 7).

33

interview, (Id. at ¶¶ 30-33), the investigators' conduct during Weakley's interview, (Id. at ¶¶ 34-41), and Hash's transfer from the Culpeper County Jail to the Albemarle-Charlottesville Regional Jail, (Id. at ¶¶ 43-52).  Hence, all the factual bases for the allegations of police misconduct, presented in the amended petition, were presented in the original petition, with the exception of the allegations concerning Lightfoot.  Accordingly, all the allegations except those regarding Lightfoot stem from a "common core of operative facts" and thus relate back to the original petition and are properly before this Court.  Mayle, 545 U.S. at 659.  Because the allegations against Lightfoot are not timely, this court does not consider them.

## IV.  Discussion

Petitioner presents four claims in his petition for habeas corpus.  Claims IA and IB are Sixth Amendment ineffective assistance of counsel claims.  Claims IIA and IIB are claims under the Due Process Clause of the Fourteenth Amendment.

### A. Hash's Ineffective Assistance of Counsel Claims:  Claims IA and IB

In Claim IA, Hash asserts that his trial counsel was ineffective for failing to fully investigate Carter.  Hash argues that a proper investigation would have revealed information that counsel could have used at trial to undermine Carter's testimony, which ultimately proved damaging to Hash's case.  In Claim IB, Hash asserts that his trial counsel was ineffective for failing to present an alternate theory of the crime based on evidence from the crime scene and testimony from Investigator Carter.  Hash argues that had counsel presented an alternate theory of the crime it would have undermined the Prosecution's theory that three people, Hash, Kloby, and Weakley, murdered Scroggins.

Strickland controls both of Hash's Sixth Amendment ineffective assistance of counsel claims.  466 U.S. 668 (1984).  To prevail on an ineffective assistance of counsel claim, a

34

petitioner must demonstrate that (1) counsel's performance was deficient and (2) the deficiency prejudiced the defense. Strickland, 466 U.S. at 687. To establish deficient performance, a petitioner must show that his "counsel's representation fell below an objective standard of reasonableness." Id. at 688. In so doing, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional conduct." Id. at 690. Courts must "indulge a strong presumption" that defense counsel's conduct fell within the bounds of reasonable conduct to avoid the distortion of hindsight. Yarbrough v. Johnson, 520 F.3d 329, 337 (4th Cir. 2008) (quoting Strickland, 466 U.S. at 689). Indeed, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

To establish prejudice, a petitioner "must show that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The Supreme Court has defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Id. at 694. Specifically, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695; see also Harrington v. Richter, 131 S. Ct. 770, 792 (2011) ("The likelihood of a different result must be substantial, not just conceivable."). However, that is not to say the petitioner must prove that the jury's verdict would have been different. Gray v. Branker, 529 F.3d 220, 234-35 (4th Cir. 2008) (reversing and awarding habeas relief because the state court, in assessing prejudice, asked whether the "jury would necessarily" have reached a different conclusion but for counsel's deficiency). Further, since the prejudice determination requires the court to "consider the totality of the evidence before the judge or jury ... a verdict or conclusion only weakly supported by the

35

record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696; see also Brown v. Smith, 551 F.3d 424, 434-35 (6th Cir. 2008) ("Where there is relatively little evidence to support a guilty verdict to begin with ... the magnitude of errors necessary for a finding of prejudice will be less than where there is a greater evidence of guilt."). Finally, a finding of prejudice is more likely appropriate where the jury has a false impression of the reliability of a key prosecution witness. See, e.g., Monroe, 323 F.3d at 314 ("If the prosecution had complied with its disclosure obligations, however, [the witness's] testimony would have been significantly undermined, and there is a reasonable probability that the ... prosecution ... would have collapsed."); Boone v. Paderick, 541 F.2d 447, 448 (4th Cir. 1976) (holding a writ of habeas corpus should issue where "the prosecutor concealed an offer of favorable treatment to [petitioner's] principal accuser" and "[h]ad the jury known of the prosecution witness' compelling motivation to establish [petitioner's] guilt, there is a reasonable likelihood its verdict might have been different").

Nonetheless, in the context of a habeas petition the Strickland standard has been described as "doubly deferential" because the deferential review under AEDPA overlaps with the deferential standard under Strickland. Pinholster, 131 S. Ct. at 1410-1411. Courts must "apply the two standards simultaneously rather than sequentially," which "imposes a very high burden for a petitioner to overcome, because these standards are each 'highly deferential' to the state court's adjudication and, 'when the two apply in tandem, review is doubly so.'" Richardson v. Branker, Nos. 11-1, 11-2, 2012 WL 362038, at *7 (4th Cir. Feb. 6, 2012) (quoting Harrington, 131 S.Ct. at 788) (citations and internal quotation marks omitted).

### 1. Claim IA: Trial Counsel's Failure to Investigate and Impeach Paul Carter

36

This Court reviews whether the Virginia Supreme Court's holding that "because Carter's credibility was sufficiently impeached by Hash's attorneys regarding his motivation for testifying and because the letters did not provide additional impeachment information, Hash has not shown that there is a reasonable probability of a different result had Hash's attorneys impeached Carter with his letters," Hash, 686 S.E.2d at 213-14, was "incorrect to a degree that this conclusion 'was so lacking in justification that [it] was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" Richardson, 2012 WL 362038, at *9 (quoting Harrington, 131 S. Ct. at 786-87).[24] The Court's review is limited to the record before the Virginia Supreme Court. Pinholster, 131 S. Ct. at 1398 (noting § 2254(d)(1) review is limited to the record before the state court).

The Virginia Supreme Court concluded that Hash's trial counsel's conduct was not prejudicial chiefly because it viewed the letters in Carter's federal file as cumulative. Hash, 686 S.E.2d at 216. The Virginia Supreme Court reasoned that "the letters did not provide additional impeachment to what Hash's attorneys had accomplished through eliciting testimony from Carter about the relationship between his testimony against Hash and a reduction of Carter's sentence." Id. Hash's argument that Carter's testimony was a significant reason for his conviction, was rejected because Hash's "attempts to minimize the significance of his own statements to the police and trial testimony" were unpersuasive in light of the fact that "[a]t the habeas hearing Hash's attorneys testified that they considered Hash's pretrial statements to the

---

[24]The Culpeper Circuit Court and the Virginia Supreme Court both found that Hash's trial counsel's failure to investigate Carter satisfied the deficient performance prong of Strickland. Respondent conceded this argument when he failed to challenge it in briefing before the Virginia Supreme Court. Hash, 686 S.E.2d at 212 ("The Commonwealth did not appeal the circuit court's holding that the performance of Hash's attorneys at trial was deficient under Strickland."). Accordingly, for Claim IA, the only question before this Court is whether the Virginia Supreme Court's decision regarding prejudice "resulted in a decision that was contrary to, or an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

police and his trial testimony to be the biggest distinction between Hash's conviction and co-defendant Kloby's acquittal." Id.

Notwithstanding the deferential lens through which this Court must review the Virginia Supreme Court's ruling, the Virginia Supreme Court's conclusion was objectively unreasonable. As noted above, a state court decision is an "unreasonable application" of federal law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case…or is unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." Conaway, 453 F.3d at 581. The Virginia Supreme Court's decision runs afoul of this standard because it (1) ignored contradiction between Carter's testimony at trial and the statements made in his letters, which indicated the letters were not simply cumulative and (2) failed to consider the impact letters in Carter's own handwriting would have had on the jury, as opposed to his statements on cross-examination.

First, at trial Carter testified that he was expecting "nothing" for his testimony. (Trial Tr. at 729). Further he answered "no" when asked if Investigator Jenkins and Investigator Mack had promised him anything. (Id. at 729). On cross-examination, Carter admitted to having spoken to Investigators Jenkins and Mack about Hash and having requested help with his federal sentence, but he continued to deny the fact that he expected them to help him. Specifically,

> Q: You called the investigators, and after you gave them information, did you ask them that if it was possible, for them to speak on your behalf to the U.S. Attorney?
>
> A: Yeah, I did.
>
> Q: Okay.
>
> A: But they didn't.

Q: Excuse me?

A: They didn't – they didn't talk to him.

(Id. at 733).  Later during cross-examination, Carter admitted to knowing what a substantial

assistance motion was and stated that he had only testified against "one dude" previously in

order to get a substantial assistance motion.  (Id. at 735-36).  Carter further admitted that he

knew what a Rule 35(b) motion was, but crucially denied knowledge of whether one could get a

Rule 35(b) motion for testimony in state court:

Q:  Okay.  Now, under the federal rules, you know what a Rule
35B is, don't you?

A:  Yes, I do.

Q: And why don't you tell the jury what that is?

A:  It's where you come back within a year to get your time cut.

Q:  Okay.  So you can further reduce your sentence if you testify
within twelve months of July 3rd of 2000, is that right?

**A:  I don't know if the state applies to the fed.**

Q:  Well, when you called the – when you talked to the
investigators, that's what your – that's what you called them about,
right?

A: When I called the investigators?

Q:  When you called Mr. Close and when you talked to the
investigators, wasn't that for the purpose of reducing your sentence
potentially?

A:  Somewhat, yes, but if somebody – that could have been my
grandmother, your grandmother or somebody else.  I would feel
somebody else would do the same thing for me.

(Id. at 735-37) (emphasis added).  Further, when asked whether a substantial assistance or Rule

35(b) motion simply required "helping the prosecutor with the case," Carter answered "Yeah,

39

that's a federal case. It don't say nothing about state case." (Id. at 741). However, this

testimony was false and misleading. Had Hash's trial counsel been in possession of the letters in

Carter's federal file they could have proven it while Carter was on the stand. Specifically,

Carter's letters to Judge Michael and the Probation Office of the Western District of Virginia

sent before Hash's trial stated:

- "I have talk[ed] to the D.A. of Culpeper Gary Close and the two lead detective[s] in this case and they are willing to come to court for me to tell how my information help assist them in there [sic] case and help got there [sic] man for murder." (Carter 8/13/00 letter).

- "I'm very sure that I will receive the motion for Rule 35(b)." (Carter 10/26/2000 letter).

- "I'm very sure that I would be granted the Rule 35b motion …. Scott Jenkins the police that [is] heading the murder case said he would speak for me at my Rule 35(b)." (Carter 11/7/2000 letter).

- "I talk to Gary Close the prosecutor of Culpeper Co and the police Scott Jenkins. I gave some key statements about the Capital Murder case on Michael Hash. They both are more than willing to talk on my behalf in court. I know that this is enough to file for the Rule 35b." (Carter 11/8/00 letter).

Thus, the letters in Carter's federal file directly contradicted Carter's testimony,

demonstrating that Carter believed he was eligible for a sentence reduction based on his

testimony at Hash's trial. The letters could have been used to impeach Carter's statement that he

expected "nothing" in return for his testimony, his "no" answer to the question of whether the

Investigators had promised him anything in exchange for his testimony, and his statement that he

didn't know "if the state applies to the fed." Furthermore, because Hash's trial counsel was not

able to specifically contradict Carter's statement that he expected "nothing" in return for his

testimony the jury was not informed of the potential impact Carter's testimony in Hash's trial

would have on Carter's federal sentence because all that was revealed on cross-examination was

that it might be possible for Carter to receive a sentence reduction "if the state applies to the

fed." Thus, the jury was not given an opportunity to appreciate Carter's powerful motivation to fabricate his testimony to ensure he received the maximum sentence reduction possible.

Second, implicit in the Virginia Supreme Court's decision that the letters were cumulative and that failure to use them was not prejudicial was the understanding that impeachment without the letters was just as powerful as impeachment based on the letters. However, this misapprehends the applicable law because all impeachment is not of the same quality. Here, Carter's letters not only contained information revealing Carter's true expectations, they conveyed his true expectations more powerfully than counsel was able to elicit on cross-examination. See United States v. Pacelli, 491 F.2d 1108, 1119 (2d Cir. 1974) (reversing a conviction and ordering a new trial where government had failed to disclose a witness's letter because "[a]lthough appellant's counsel possessed an abundance of impeaching material which he exploited at trial, none of this information conveyed quite so forcefully as [witness]'s letter"). Indeed, in cases discussing the prejudice standard in the context of Brady violations, the Supreme Court and the Fourth Circuit have highlighted the importance of presenting the actual evidence that a witness has motive to testify falsely, as opposed to merely asking about motive on cross-examination. See e.g., Giglio v. United States, 405 U.S. 150, 151 (1972) (finding prejudice even though "[d]efense counsel vigorously cross-examined, seeking to discredit [witness's] testimony by revealing possible agreements or arrangements"); Boone, 541 F.2d at 451 (acknowledging that even "defense counsel's 'searing attack'" on cross-examination was not enough to overcome the jury's belief "that it rested upon conjecture which the prosecutor disputed"); Monroe, 323 F.3d at 314 (rejecting government's argument that notwithstanding missing evidence revealing government's agreement with a key witness, "it was

41

obvious to the jury that [the witness] expected consideration from the prosecution in exchange for her trial testimony").

The Court is also not persuaded by Respondent's attempt to diminish the importance of Carter's testimony at Hash's trial.  Respondent asserts that Carter's credibility would not have been impeached by the use of the letters because "Carter's credibility was established by his knowledge of critical facts about the murder" and "only the killers could have known such details," Hash, 686 S.E.2d at 213; see also (Dkt. No. 48 at ¶¶ 51, 53, 57), or that Carter's testimony "was not the only, or even the most important, difference between [Kloby and Hash's] trials," (Dkt. No. 48, at ¶ 56).  In fact, Respondent conceded this very argument before the Virginia Supreme Court.  As part of a line of questioning about the evidence in the case, when asked if the Commonwealth had "any statement from the petitioner placing him at the scene?" the Commonwealth responded "No, Your Honor, none whatsoever.... But primarily, what you have is testimony from Paul Carter that the defendant had confessed including details." (Va. Sup. Ct. Oral Arg. Tr. at 20-21).  Clearly, Carter's testimony – because it was the only evidence that Hash confessed to the crime – was an essential component of the Commonwealth's case.[25]

Furthermore, Respondent's argument falters because it seeks to hold Petitioner to a standard that even Strickland does not impose.  Under Strickland a petitioner is not required to disprove or impeach every detail of the State's trial evidence.  See e.g., Strickland, 466 U.S. at 693 (nor must a petitioner "show that counsel's deficient conduct more likely than not altered the outcome in the case"); Griffen v. Warden, 970 F.2d 1355, 1359 (4th Cir. 1992) (reversing and awarding habeas relief because district court required petitioner to "demonstrate affirmatively that, but for trial counsel's unprofessional errors, the results would have been different").

---

[25] See also infra Section IV.B.1 (highlighting inaccuracies in Carter's initial statement to the investigators).

42

Indeed, all that is required is a reasonable probability that the result at trial would have been different, which is defined as a probability "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693-94.

Thus, the Virginia Supreme Court unreasonably applied Strickland when it held that Hash's trial counsel's failure to investigate Carter's federal file was not prejudicial.  This Court finds that Hash's trial counsel's conduct was prejudicial because the letters were not cumulative, but rather provided direct evidence that Carter lied while testifying and provided evidence not elicited on cross-examination of Carter's powerful motivation to fabricate his testimony. Accordingly, Hash is entitled to habeas relief on Claim IA.

### 2. *Claim IB: Failure to Present an Alternate Theory of the Crime*

Hash argues that the Culpeper Circuit Court's refusal to find that his trial counsel's failure to present evidence of an alternate theory of the crime constituted deficient performance was an objectively unreasonable application of Strickland.[26]  Respondent counters that this strategy was reasonable because before the trial "the attorneys [were] told there were no viable suspects" by a Culpeper Sheriff's Deputy.  (Dkt. No. 45, at ¶ 40).  This Court's review of the Culpeper Circuit Court's holding is limited to the record before the Culpeper Circuit Court. Pinholster, 131 S. Ct. at 1401.

The Culpeper Circuit Court, in denying Hash relief, held:

> In considering the totality of the evidence before the jury,
> and the evidence from the hearing, this Court concludes
> that the attorneys for petitioner made a reasonable
> investigation into the evidence related to the other persons
> of interest and thereafter made a reasonable decision to

---

[26] The Court looks to the reasoning of the Culpeper Circuit Court's opinion denying habeas relief because the Virginia Supreme Court did not grant Hash's Petition for Appeal on this claim, and thus the Circuit Court's decision is the last state court decision on the merits of this claim.  Ylst v. Nunnemaker, 501 U.S. 797, 801-02 (1991).

43

pursue a defense on the theory that Eric Weakely was
involved in the murder.

(Culpeper Cir. Ct. Op. at 19).  In its reasoning, the court identified the correct legal standard:

"...the Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective

assistance must be based on professional decisions and informed legal choices can be made only

after investigation of options."  (Id. at 18-19 (quoting Strickland, 466 U.S. at 680)).  And

correctly explained that failure to "conduct a substantial investigation into each of several

plausible lines of defense...may nonetheless be effective" provided counsel does not "exclude

certain lines of defense for other than strategic reasons.... Those strategic choices about which

lines of defense to pursue are owed deference commensurate with the reasonableness of the

professional judgments on which they are based." (Id. at 19 (quoting Strickland, 466 U.S. at 680-

81)).

However, in its application of those principles to Hash's case the Culpeper Circuit Court

erred, even when viewed through AEDPA's deferential lens.  The Culpeper Circuit Court

explained that because Hash's trial counsel (1) "were provided with numerous police reports

which they copied and reviewed," and (2) because "they discussed the case with [Investigator]

Carter and he explained that the leads had gone cold and the investigation was at a dead end," it

was reasonable conduct for Hash's trial counsel to not attempt to prove Weakley's testimony was

false and to not present an alternate theory of the crime. (Id.).

This does not, however, satisfy Strickland's requirement of a reasonable investigation.

Contrary to Respondent's argument, it is not a reasonable strategic choice for defense counsel to

rely on the finding of a police investigation.  Counsel has an obligation to make its own

independent investigation and not to rely on the investigation completed by the police.  See

Elmore, 661 F.3d at 854 (finding counsel's performance was deficient when they were "lulled

44

into inaction by the belief that the police were above reproach"); Anderson v. Johnson, 338 F.3d 382, 392 (5th Cir. 2003) (counsel was ineffective when "he relied exclusively on the investigative work of the State and based his own pretrial 'investigation' on assumptions divined from a review of the State's files"). Indeed, the requirement of reasonable investigation is particularly important in light of the fact that "fail[ure] to make a reasonable investigation" renders "an informed tactical decision … impossible." Bell v. True, 413 F. Supp. 2d 657, 699 (W.D. Va. 2006).

In Elmore, the Fourth Circuit granted an ineffective assistance of counsel claim based on a failure to investigate. Although the state's case hinged on the forensic evidence collected at the scene, the petitioner's trial attorneys "conducted no independent analyses of the State's forensic evidence" and "did not otherwise mistrust the State's case against [the petitioner]." Elmore, 661 F.3d at 853-54, 861. Regarding the duty to investigate under Strickland, the Fourth Circuit commented:

> A healthy skepticism of authority, while generally advisable, is an absolute necessity for a lawyer representing a client charged with capital murder. After all, the custodians of authority in our democracy are ordinary people with imperfect skills and human motivations. The duty of the defense lawyer "is to make the adversarial testing process work in the particular case," Strickland, 466 U.S. at 690, 104 S.Ct. 2052—an obligation that cannot be shirked because of the lawyer's unquestioning confidence in the prosecution.

Id. at 859. Although forensic evidence is not at issue in this case, as there is none linking Hash to Scroggins' murder, Hash's trial counsel's failure to present an alternate theory of the crime had the same effect as Elmore's attorneys' failure to challenge the forensic evidence. In Hash's case, the Commonwealth's case depended critically on Hash's alleged confession to Carter and to a lesser extent the testimony of Weakley. Carter and Weakley's testimony were the primary

45

pieces of evidence establishing Hash's presence at the scene of the crime and establishing the Commonwealth's belief the murder had been perpetrated by three individuals. Hash's counsel's failure to present an alternate theory, including evidence from the crime scene and the testimony of Investigator Carter, who believed the murder was committed by a single perpetrator, meant Hash was prevented from effectively contesting his presence at the crime scene and thus his connection to the murder.

Moreover, the Culpeper Circuit Court's further explanation that because "David Carter and the other investigators were not able to develop any evidence that directly linked the persons of interest to the murder, or to Eric Weakley... the Court concludes that it is unlikely that such evidence would have been allowed at the trial" does not render Hash's trial counsels' failure to investigate reasonable under Strickland. (Culpeper Cir. Ct. Op. at 20 (citing Johnson v. Commonwealth, 529 S.E.2d 769, 784 (Va. 2000)). Had Hash's counsel conducted an independent investigation and not been able to find any admissible evidence of an alternate theory of the crime, then Hash's trial counsel's decision not to present an alternate theory of the crime might have been reasonable. However, that is not the case here –Hash's counsel failed to conduct any independent investigation. Hash's counsel appears to have made no attempt to develop evidence linking persons of interest to the murder and instead simply relied on the police's statement that they could not be linked. Because Hash's trial counsel never pursued an independent investigation into an alternate theory of the crime, but instead accepted the police's investigative work and conclusions, "there could be no reasonable strategic decision either to stop the investigation or to forgo use of the evidence that the investigation would have uncovered." Elmore, 661 F.3d at 864. Accordingly, the Culpeper Circuit Court's application of

the <u>Strickland</u> performance prong was objectively unreasonable and Hash's trial counsel's performance was, in fact, deficient.

Having established that the Culpeper Circuit Court's application of the performance prong of <u>Strickland</u> was objectively unreasonable and that Hash's trial counsel's failure to present an alternate theory of the crime constituted deficient performance, this Court must now consider whether that deficient performance was prejudicial. The Culpeper Circuit Court did not consider whether Hash's trial counsel's deficient performance was prejudicial and thus in making the prejudice determination this Court is permitted to consider all the evidence before it. See <u>Pinholster</u>, 131 S. Ct. at 1401.

This Court finds that Hash's trial counsel's failure to investigate and present an alternate theory of the crime was prejudicial. When weighing the evidence the court must "'consider the totality of the evidence before the ... jury' in determining whether there was 'a reasonable probability, that but for counsel's errors, a different verdict would have been returned.'" <u>Elmore</u>, 661 F.3d at 868 (quoting <u>Strickland</u>, 466 U.S. at 695). Specifically, in the context of a failure to investigate claim the Fourth Circuit has said "the court should have evaluated the collective trial evidence together with the collective evidence that a reasonable investigation of the State's forensic evidence would have uncovered." <u>Id.</u> at 868.

Had Hash's trial counsel conducted a reasonable investigation and presented evidence of an alternate theory of the crime that evidence would have shown the jury why the Commonwealth's multi-perpetrator theory was inconsistent with the evidence at the crime scene. In particular, Petitioner could have presented evidence showing that (1) the hallway of Scroggins' home where she was murdered was too narrow to accommodate three people and thus it was likely the crime was committed by a single perpetrator, (State Habeas H. Tr. at 248-250,

255); (2) the driver's seat of Scroggins' truck, recovered the day after the murder approximately one mile from her home, was positioned "up underneath the steering wheel," which would have made it "very difficult" for someone six feet or taller, such as Hash, to drive, (Id. at 257); (3) another suspect, Scott, was known to have access to the same caliber rifle that was used to murder Scroggins, (State Habeas Ex. 7); (4) Scott lived within walking distance of Scroggins, (State Habeas Ex. 4); (5) a man matching Scott's description was seen the day after the homicide near the location where Scroggins' truck was found (State Habeas Ex. 10); (6) Investigator Jenkins' statement that "Billy Scott was never eliminated as a suspect," (Jenkins Aff. at ¶ 5); and (7) Investigator Jenkins' statement: "I have very serious concerns about the conviction of Mike Hash. I believe the Sheriff's Department investigation was not handled properly. Based on the evidence at the crime scene, I believe it is highly unlikely that three teenage boys murdered Mrs. Scroggins," (Jenkins Aff. at ¶ 14). This evidence, which strongly refutes the Commonwealth's theory of the case, weighed against the overall weakness of the Commonwealth's case, which included no physical evidence linking Hash to the murder, compels the conclusion that there is a reasonable probability that, but for the failure of Hash's counsel to investigate and present an alternate theory of the crime, Hash's trial would have been decided differently. See Stouffer v. Reynolds, 214 F.3d 1231, 1234 (10th Cir. 2000) (finding prejudice where trial counsel failed to present crime scene evidence showing "numerous inconsistencies with the State's theory of the case"). Because Hash has established deficient performance and prejudice, this Court grants Hash's request for habeas relief on Claim IB.

### B. Due Process Violations:  Claims IIA and IIB

In Claim IIA, Hash alleges that the Prosecution orchestrated Carter's testimony and concealed a deal with Carter that gave him favorable treatment in exchange for his testimony against Hash. Hash further alleges that the Prosecution then knowingly used Carter's perjured

testimony.  In Claim IIB, Hash argues that the Culpeper County Sheriff's Office and the

Prosecutor's conduct during the investigation deprived Hash of his right to due process.

### 1. Claim IIA: The Commonwealth Concealed Deal with Carter and Offered Perjured Testimony

Hash argues that the evidence establishes that Culpeper officials orchestrated Carter's

testimony and had an agreement with Carter that they failed to disclose, in violation of Hash's

right to due process under Giglio v. United States, 405 U.S. 150 (1972), and Napue v. Illinois,

360 U.S. 264 (1959).[27]  Throughout the state habeas proceedings, Respondent denied knowledge

of any attempt to orchestrate Carter's testimony.  As recently as August 24, 2011,

Commonwealth's Attorney Close testified that Hash had been transferred to the Albemarle-

Charlottesville Regional Jail to be closer to his counsel.  (Close Dep. Tr. at 83) ("[D]efense

counsel was from Charlottesville and they, you know, it was a long drive for them to come up to

Culpeper and so it helped them somewhat to move him down closer….").  However, on

December 2, 2011, Sheriff Hart admitted that Hash was transferred to be exposed to Carter:

> [O]ne of the investigators approached me to propose that Hash be
> transferred from the Culpeper County Jail to a correctional facility
> in the Charlottesville area, and it was my understanding the
> purpose was to obtain information by the informant from Hash….
> I did not feel comfortable approving the proposed transfer.
> Instead, I told the investigator to seek authorization from
> Commonwealth's Attorney Gary Close before said transfer.

(Hart Aff. at ¶ 5, 6).  Subsequently, on January 6, 2012, nearly four and a half months after his

deposition, Commonwealth's Attorney Close filed an errata admitting to the conversation

concerning Hash's transfer and conceding that Hash was moved to Charlottesville to be put in

the presence of an informant.  (Close Errata) ("At some point in time, I assume prior to the

---

[27] Because Respondent conceded that Hash can show cause and prejudice with regard to this claim, the Court reviews the claim de novo.

transfer, I had a conversation with Bruce Cave wherein he told me that the Sheriff's Office was thinking about moving Hash to a jail where there was a snitch."). Respondent has also conceded that "a promise or agreement was made by Jenkins that he would in fact talk to the U.S. attorney on behalf of Carter, if in fact asked by the U.S. attorney or Carter to do so." (Fed. Dist. Ct. H. at 22-23). Despite these concessions, Respondent maintains that Hash has not shown he is entitled to habeas relief because the promise or agreement between Investigator Jenkins and Carter was not the kind of promise or agreement that must be disclosed under Giglio and thus there was no violation of Hash's due process rights.

To establish a due process violation under Giglio, a petitioner must show that there was a concealed promise or agreement and that the concealment was material and therefore prejudicial. "Giglio and Napue set a clear precedent, establishing that where a key witness has received consideration or potential favors in exchange for testimony and lies about those favors, the trial is not fair." Tassin v. Cain, 517 F.3d 770, 778 (5th Cir. 2008). In Napue, the State's principal witness testified that "he had received no promise of consideration in return for his testimony" when "the Assistant State's Attorney had in fact promised him consideration...." 360 U.S. at 265. Notwithstanding his knowledge, the Assistant State's Attorney did not correct the witness's testimony. In holding that such a failure to correct testimony violated the defendant's due process rights, the Supreme Court reasoned "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Id. at 269. In Giglio, building on Napue, the Supreme Court ruled that not only is failure to correct perjured testimony a due process violation, but that the State is required

to disclose such agreements and understandings.[28] Giglio, 405 U.S. at 154-55 (reversing conviction where "Government's case depended almost entirely on [a particular witness]'s testimony" and Government failed to disclose the agreement because "credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it").

Under Giglio, failure to disclose is material and thus prejudicial, if "'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury....'" 405 U.S. at 154 (quoting Napue, 360 U.S. at 271). Prejudice is said to exist "when the government's evidentiary suppression undermines confidence in the outcome of trial." Kyles v. Whitley, 514 U.S. 419, 434 (1995).

Respondent's attempt to distinguish the present case from Giglio and its Fourth Circuit progeny, Boone, 541 F.2d 447, is unpersuasive. Respondent argues that both Giglio and Boone involved actual promises – a promise not to prosecute and a promise not to arrest, respectively – whereas, the promise in Hash's case was not sufficiently definite to rise to the level that required disclosure. In support of this distinction and Respondent's position that only certain types of agreements must be disclosed, Respondent relies on a line of cases from the Eleventh Circuit holding that "[s]ome promises, agreements, or understandings do not need to be disclosed, because they are too ambiguous, or too loose or are of too marginal a benefit to the witness to count." United States v. Curtis, 380 F.3d 1311, 1316 n.7 (11th Cir. 2005), modified on other

---

[28] It is irrelevant whether the offer or agreement emanates from the police or the Prosecutor. See e.g., Boone, 541 F.2d at 450-51 ("The police are also part of the prosecution, and the taint on the trail is no less if they, rather than the State's Attorney, were guilty of the nondisclosure"); United States v. Sutton, 542 F.2d 1239, 1241 n.2 (4th Cir. 1976) ("what [FBI agent] knew must be imputed to the prosecutor").

51

grounds, 400 F.3d 1334 (11th Cir. 2005) (citing Tarver v. Hooper, 169 F.3d 710, 717 (11th Cir. 1999)).

Although, the Eleventh Circuit's decision is not binding on this Court, the Court notes that (1) the decision in Curtis is distinguishable from Hash's case on its facts and (2) that the Eleventh Circuit endorsed Boone's reasoning in the Curtis decision. First, in Curtis, the Government disclosed the conversation between the State and the witness regarding whether the witness would be eligible for favorable treatment. Furthermore, after making the disclosure to defense counsel the State met with the cooperating witness and made it explicit that there was no promise on the part of the Government to file a substantial assistance motion. Finally, at trial the cooperating witness testified truthfully that although no promise had been made, the witness hoped the Government would assist him at his sentencing. Curtis, 380 F.3d at 1313. In the present case, conversations between Carter and the State were not disclosed to defense counsel, there was no supplemental meeting between the State and Carter to confirm that no promises had been made, and finally, at trial Carter lied when he stated that he did not expect anything in exchange for his testimony because based on the letters he sent Judge Michael it was clear he did. Second, in Curtis the Eleventh Circuit agreed with the Fourth Circuit's statement in Boone that "tentativeness may increase ... relevancy" of an agreement for favorable treatment. Id. at 1316 (quoting Boone, 541 F.2d at 451).

Moreover, Boone is strikingly similar to Hash's case. In Boone, the habeas petitioner had been convicted of armed robbery and statutory robbery primarily on the basis of testimony from his alleged accomplice who had become a cooperating witness for the State. 541 F.2d at 449. The Fourth Circuit found a Giglio violation where a police officer's statement to the cooperating witness, prior to trial, that "he would use his influence with the Commonwealth

52

Attorney in order to see that [the witness] would not be prosecuted" was not disclosed. Id. at

449.  At the habeas evidentiary hearing the police officer testified that he had emphasized to the

witness that "this was a limited promise, and that while he would use his influence with the

Commonwealth Attorney, there 'was an element of risk here' … because [the police officer]

could not control the actions of others." Id. at 449 n.1.

Defense counsel was suspicious that a promise in exchange for the witness's testimony

must have been made, and although defense counsel was successful in eliciting on cross-

examination that the witness "had not been arrested or prosecuted in connection with this offense

… counsel got nowhere in his effort to uncover the prosecutorial bargain." Id. at 449.  In closing

argument, the Prosecutor bolstered the witness's testimony by stating "at no time is anybody

more apt to tell the truth than when they are saying something that actually hurts …. And take

that test and apply it to [the witness], for instance, who has freely admitted participating in a

felony…." Id. at 450.

Like the Boone case, the present case concerns a promise, now conceded by the

Respondent, by Investigator Jenkins to talk to the U.S. Attorney on behalf of Carter regarding his

federal sentence.  Furthermore, like Boone, the Commonwealth failed to disclose the promise to

Hash's trial counsel.  On direct examination Carter testified that he was not expecting anything

in exchange for his testimony and although Hash's trial counsel attempted through cross-

examination to force Carter to admit to what Investigator Jenkins had promised him, he was

unable to get such an admission.  In fact, Carter lied stating "I don't know if the state applies to

the fed" when asked if he could get a substantial assistance motion for his testimony in Hash's

case.  (Trial Tr. at 737).  Moreover, when cross-examined about his motivation for testifying

Carter stated it was "somewhat" for the purpose of reducing his sentence, but that it was also

because "that could have been my grandmother, your grandmother or somebody else. I would feel somebody else would do the same thing for me." (Id.). Finally, in his closing argument the Commonwealth's Attorney bolstered Carter's testimony by stating:

> You know, Paul Carter, they want to suggest to you that somehow, really bothersome here, that somehow his sentencing in federal court, federal court, is connected to what's going on up here. This is a state court. That's totally different. Different prosecutors, different laws, different judges, everything is different, and I don't know what else to tell you. There's no deal with Mr. Carter. He testified to that and as to when his sentencing took place in Charlottesville, there's no evidence that was somehow purchased or whatever by the Commonwealth here, none whatsoever. Those are totally different issues.

(Id. at 1339). Commonwealth's Attorney Close now admits this statement was misleading. (Close Dep. Tr. at 119-120).

In Boone, the Fourth Circuit found a Giglio violation "despite … the tentativeness of the promise." 541 F.2d at 451. Importantly, the Fourth Circuit stated that "rather than weakening the significance for credibility purposes of an agreement of favorable treatment, tentativeness may increase its relevancy." Id. The court further explained that "a promise to recommend leniency (without assurance of it) may be interpreted by the promisee as contingent upon the quality of the evidence produced [and] the more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor." Id. Here, the promise was a similarly tentative promise as the promise in Boone. Investigator Jenkins had not yet provided the assistance Carter expected. Thus, Investigator Jenkins' offer to assist Carter with his federal sentence may have appeared to be contingent on the strength of Carter's testimony at Hash's trial, thereby increasing Carter's motivation to testify falsely.

Respondent also attempts to distinguish the present case from Boone with regard to the prejudice analysis by arguing that Carter's testimony was not the key evidence against Hash and

correspondingly the Commonwealth's case against Hash was not weak. (Dkt. No. 48, at ¶¶ 54-57). Specifically, Respondent asserts that Hash ignores the effect of Weakley's testimony, (Dkt. No. 48, at ¶ 54), and that Hash has failed to explain how Carter knew the details of the crime unless Hash told him, (Dkt. No. 48, at ¶ 57). The Court is not convinced. First, as detailed in Section III.A, Weakley has recanted his testimony and that recantation is reliable because it is corroborated by independent evidence. Second, Commonwealth's Attorney Close has admitted that Hash was transferred to the Albemarle-Charlottesville Regional Jail to be put in contact with Carter, a known prison informant. Furthermore, the evidence indicates that there were inconsistencies between Carter's statement and the evidence. Specifically, Carter stated to Investigator Jenkins that he and Hash were in the same cell block for several days, (Jenkins Dep. Tr. at 110), when in fact Hash was only at the Albemarle-Charlottesville Regional Jail for two nights and spent only the second night in a cell block with Carter, (Shiflett Aff. at ¶¶ 5, 11). Carter also stated that Hash said he shot Scroggins three times, but the crime scene evidence indicated Scroggins had been shot four times. (Jenkins Dep. Tr. at 110). Carter stated that Hash had told him they had taken items from Scroggins' home and had also taken her vehicle; however, the crime scene evidence indicated nothing had been taken from the home. (Id. at 110-11). Finally, Carter stated Hash said that "Two other dudes that was with him when they did the murder have gave him up on videotape," which was not true. (Id. at 111).[29] Indeed, Investigator Jenkins has now admitted that "more should have been done" to verify Carter's story and that "at this point in my career I would do it differently," but that "at the time I was doing the best I could" while "living under the daily thumb of the sheriff." (Id. at 130-31).

---

[29] The Court also notes that Investigators Jenkins and Mack did not review the notebook from which Carter read the details of Hash's confession. (Jenkins Dep. Tr. at 112, 124-25). Furthermore, the Investigators did not interview any other inmates in Carter's cell block to confirm Carter and Hash actually spoke. (Id. at 123). Finally, Carter, unlike Weakley and Shelton, was not polygraphed. (Id. at 123; Mack Dep. Tr. at 101).

55

Therefore, this Court concludes, like the Fourth Circuit, that Carter's testimony coupled with the Commonwealth's Attorney's closing argument "constitutes false evidence of which the prosecutor knew or should have known" because as the Fourth Circuit reasoned "the prosecutor made statements which were clearly intended to give the impression that [the witness] knew nothing about possible lenient treatment" and in the present case, that such lenient treatment could not occur because the systems were entirely separate. Boone, 541 F.2d at 450.

With regard to materiality, the Fourth Circuit has stated that a court "must examine both the importance of the [witness]'s testimony, which would be affected by his credibility, and the weight of the independent evidence of guilt." Id. at 451. In Boone, the Fourth Circuit considered the weakness of the physical evidence against the importance of the three witness's testimony, of which the cooperating witness's testimony was the most important. Id. at 452. Ultimately, the Fourth Circuit concluded that although "[t]he task of determining whether there is a 'reasonable likelihood' that evidence of the promise of favorable treatment ... would have affected the judgment of the jury is not an easy one," especially "in a case such as this where internal conflicts and inherent improbability in almost every witness' testimony suggests the possibility of perjury," when combined with the Prosecutor's statement "which buttressed [the primary witness's] credibility, there is a reasonable likelihood that the jury would have reached a different result." Id. at 453.

Similarly, this Court weighs the effect of Carter's false testimony that was bolstered by Commonwealth's Attorney Close's false statement that no promise had been made and his overall misleading suggestion that no such promise could in fact be made because the systems were entirely separate, against the complete lack of physical evidence connecting Hash to the crime and the contradictory testimony of the other witnesses. Accordingly, the Court finds that

in Hash's case there was a reasonable likelihood that the jury would have reached a different result without the false testimony. Hash has proven Commonwealth's Attorney Close's failure to disclose the agreement and subsequent bolstering of Carter's false testimony violated Hash's due process rights under <u>Giglio</u> and <u>Napue</u>.

### 2. Claim IIB: Misconduct by Culpeper Sheriff's Office and the Prosecutor's Office

Hash cites a series of facts evidencing misconduct on the part of the Culpeper's Sheriff's Department and the Prosecutor's Office in violation of his right to due process.[30] In support of this argument Hash states a "conviction cannot be brought about by methods that offend 'a sense of justice.'" <u>Rochin v. California</u>, 342 U.S. 165, 173-74 (1952). <u>See also</u> <u>United States v. Goodwin</u>, 674 F. Supp. 1211, 1217 (E.D. Va. 1987) ("there may be some circumstances in which government conduct is so offensive that a conviction should be set aside on due process grounds") <u>aff'd</u>, 854 F.2d 33 (4th Cir. 1988). Respondent counters with a procedural argument that the Court cannot consider this evidence because pursuant to <u>Pinholster</u>, this Court's review is limited to the record before the state habeas court and much of this evidence has come to light only during the current federal proceedings. (Dkt. No. 45, at ¶ 93). However, having found that Hash has made a successful showing of actual innocence, this Court may consider all of Petitioner's evidence and need not address <u>Pinholster</u>'s purported exception.

Considering the cavalcade of evidence that Hash has come forward with demonstrating police and prosecutorial misconduct, which stands largely uncontested by Respondent, this Court finds that Hash has made a sufficient showing of misconduct to find the investigation violated his due process rights and warrants habeas relief. Hash's evidence is summarized as follows.

---

[30] The allegations discussed in Section IV.B.1 also provide evidence of misconduct and are included in Petitioner's evidence of a pattern of misconduct. (Dkt. No. 49 at 25). The Court considers them as further evidence of an overall pattern of misconduct but does not specifically discuss them again in this section.

57

First, Hash has produced evidence that (1) letters written by Carter to Investigators Jenkins and Mack and (2) a response from Investigator Jenkins to one of Carter's letters were not disclosed to Hash's trial counsel. During depositions taken for the state habeas proceedings, Investigator Jenkins testified that he received two or three letters from Carter and that Investigator Mack likely received one or two letters from Carter. (Jenkins State Habeas Dep. Tr. at 65-66). Investigator Jenkins testified further that he believed he wrote Carter a letter but could not recall if the letter was sent. (Id. at 67-68).[31]

Second, the results of the polygraph examinations given to Weakley and Shelton were never produced to Hash's trial counsel. As described above, Weakley failed his polygraph examination, showing deception to questions about whether Hash ever told Weakley he shot Scroggins and whether Weakley was present at the Scroggins murder. (Weakley Polygraph at 2). Shelton's polygraph results also reveal that she lied in her testimony implicating Hash. Specifically, Shelton gave deceptive answers when asked "Are the statements you gave the police last night regarding Mike and Jason's involvement in Thelma Scroggins' death, true?" and when asked "Did you hear Mike and Jason plan to torture and kill Thelma Scroggins?" (Shelton Polygraph at 5-6). Furthermore, Agent Carwile, a certified polygraph examiner, reviewed the results and testified that "anybody that failed the examination to this extent wouldn't be a very credible witness in my opinion." (Carwile Dep. Tr. at 55). In response, the Respondent argues that the results were transmitted to the Commonwealth's Attorney who would have placed them

---

[31] After trial the letter was discovered in Carter's federal file because Carter forwarded the letter to Judge Michael. (Jenkins 3/12/01 Letter to Carter). Furthermore, Commonwealth's Attorney Close has now admitted, as part of the federal proceedings, that these letters ought to have been disclosed. When asked if an "offer[] to speak to the federal prosecutor...[rose] to the level of something that should be disclosed to the defense" Commonwealth's Attorney Close replied "Yeah, I think so," thereby admitting that disclosure of the letters from Carter to the Investigators and Investigator Jenkins' response to Carter should have been disclosed to Hash's trial counsel.

58

in his file and "[s]ince the Commonwealth's Attorney maintained an 'open file' policy, the

polygraphs results were available to defense counsel long before trial." (Dkt. No. 51 at ¶ 47).

Commonwealth's Attorney Close admitted during his deposition that "if [results of a polygraph

are] in my file, I would provide it." (Close Dep. Tr. at 26). He further testified that "if, you

know, if I had a witness that failed a polygraph, I would think that that would be exculpatory and

I would reveal that, whether it was verbal or not." (Close Dep. Tr. at 30). However, Hash's trial

counsel did not have either Weakley or Shelton's polygraph results.

Third, the Prosecution concealed negotiations with Weakley regarding a plea agreement

in exchange for his testimony.[32] At Hash's trial, Weakley, like Carter, testified that there was no

deal relating to his testimony and that he did not expect any benefit as a result of his testimony.

Specifically, the following exchange took place:

> Q: Okay. Now, have you received any promises for your
> testimony today?
>
> A: No, sir.
>
> Q: Do you have any expectation of anything happening?
>
> A: No, sir.
>
> Q: You've talked to your attorney about this, correct?
>
> A: Yes.
>
> Q: Did Investigator Jenkins or Investigator Mack, did they
> promise you anything?
>
> A: No.

---

[32] The amended complaint appears to include these allegations in Claim IIA. (Dkt. No. 6 at ¶¶ 131-36). However, in Hash's Memorandum of Law in Opposition and Response to Respondent's Third Motion to Dismiss and Rule 5 Answer, (Dkt. No. 49 at 26), the claims are discussed substantively as part of Claim IIB. The Court considers these allegations as part of Claim IIB.

(Trial Tr. at 602). Furthermore, during closing argument the Commonwealth's Attorney stated that Weakley had not been promised anything for his testimony. (Id. at 1281) ("Now, defense counsel will probably tell you, [Weakley, Shelton and Carter have] got all – you know, they've got the expectation of promises and they think all kinds of things are going to happen to them. Well, you've heard what they said. What else can they do except tell you, I don't have an expectation of anything happening. There's no promises been made to me."). However, negotiations with Weakley came to light in a report produced in 2011 by the Virginia State Police. The June 15, 2000, report indicates that "Eric Weakley's attorney has been in negotiation with the Commonwealth's Attorney to make a deal whereby Weakley would testify against Hash and Kloby." (Carwile 6/15/00 Report). The plea agreement negotiations are corroborated by the fact that although Weakley was initially charged with capital murder, the preliminary hearing on that charge was continued approximately five times until Weakley testified against both Hash and Kloby.[33] On February 20, 2001, after Hash's conviction on February 9, 2001, Weakley's charge was amended from capital murder to second degree murder. Ultimately, Weakley entered into a plea agreement, pursuant to which he was sentenced to six years and eight months imprisonment. (Weakley Sentencing H. Tr. at 27).

Fourth, the Culpeper investigators impermissibly coached Weakley regarding how to answer their questions and may have fed Weakley information about the crime. As discussed above, Weakley has now recanted all prior statements that implicate Hash in the murder of Scroggins, and his recantation is corroborated by statements by Investigator Jenkins. Finally, Investigator Jenkins and Commonwealth's Attorney Close, who previously maintained that all portions of the interviews of Weakley were recorded, now admit that this is not true. (Jenkins

---

[33] Hash submitted copies of Weakley's continuance orders indicating Weakley's preliminary hearing was continued on 5/17/00, 5/25/00, 6/20/00, 8/31/00, and 9/19/00.

60

Dep. Tr. at 74); (Close Dep. Tr. at 68). This is significant because the interview that directly preceded Weakley's first implication of Hash was not recorded. Specifically, in his first three interviews Weakley denied involvement in the Scroggins' murder. (Cave Dep. Tr. at 21, 25). Then, Investigator Bruce Cave ("Investigator Cave") had an unrecorded conversation with Weakley and following that unrecorded conversation Weakley changed his story and stated he was present when Hash and Kloby murdered Scroggins. (Id. at 20-25).

Fifth, in 1999, Investigator Carter saw a .22 Winchester rifle at the residence where Scott lived at the time of Scroggins' murder. However, Investigator Carter failed to take custody of the rifle and test it, despite the fact that the .22 Winchester rifle matched the caliber bullet recovered at the crime scene. Indicative of the failings of this investigation, Investigator Jenkins has recently stated that "the Sheriff's Department investigation was not handled properly," and, as a result, he has "very serious concerns about the conviction of Mike Hash." (Jenkins Aff. at ¶ 6).

The cumulative effect of this misconduct violated Hash's right to due process. While Petitioner does not distinguish between prosecutorial and police misconduct, as slightly different standards apply to each, this Court must. All but two of Hash's allegations – that Investigators Jenkins and Mack improperly coached Weakley during his interviews and that Investigator Carter failed to take custody of and test the .22 Winchester rifle – can be viewed as prosecutorial misconduct.

As regards the allegations of prosecutorial misconduct, the Court asks "'whether the [misconduct] so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal quotations omitted). To prove reversible error, the defendant must show (1) 'that the

prosecutor's remarks or conduct were improper' and (2) 'that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial.' United States v. Scheetz, 293 F.3d 175, 185 (4th Cir. 2002)." U.S. v. Caro, 597 F.3d 608, 624-25 (4th Cir. 2010). Here the Prosecutor's Office engaged in a series of lies and failures to disclose exculpatory evidence to Hash's trial counsel.[34]  Without access to this information Hash was denied the opportunity to effectively cross-examine the State's witnesses against him, in particular their motivation to falsify their testimony.

As regards the allegations of police misconduct, the Court looks to see whether the conduct rose to the level of "outrageous misconduct." U.S. v. Dyess, 478 F.3d 224, 235 (4th Cir. 2007).[35]  Here, the conduct of Investigators Jenkins and Weakley, who coached Weakley's answers regarding Weakley's knowledge of crime scene details, so as to make his statement more reliable, rises to the level of outrageous misconduct because the acts were intentional and not merely negligent. Akins v. Epperly, 588 F.3d 1178, 1183 (8th Cir. 2009) ("Conduct intended to injure will generally rise to the conscience-shocking level, but negligent conduct falls 'beneath the threshold of constitutional due process.'") (quoting Lewis, 523 U.S. at 849).  Indeed, the Court notes that the parallels between this case and Nickerson v. Roe, 260 F. Supp. 2d 875 (N.D. Cal. 2003) abrogated by Lee v. Lampert, 610 F.3d 1125 (9th Cir. 2010), are striking.  In Nickerson, noting that the Prosecution's case was "potentially the product of improper police conduct," the district court awarded habeas relief, concluding that "the resulting conviction [was]

---

[34] Some of the evidence that the Prosecutor failed to disclose may give rise to a Brady v. Maryland, 373 U.S. 83 (1963), violation, but the Court need not address that because a finding of prejudicial prosecutorial misconduct is sufficient to warrant habeas relief.

[35] "[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998).

a denial of due process." Id. at 918.  The Nickerson police investigation was marked by (1)

pressuring witnesses to identify the petitioner as the perpetrator; (2) "[giving] … cues and

[asking] leading questions" in witness interviews; (3) suppression of exculpatory evidence; and

(4) loss or destruction of notes relating to communications with key witnesses.  Id. at 914-18.

Like Nickerson, Hash has presented evidence that (1) Weakley's statement was the result of

coaching; (2) exculpatory evidence in the form of failed polygraph examinations were not

disclosed to trial counsel; and (3) communications between the police and Carter have been lost

and were not disclosed.

 Conversely, the Court is not convinced that Investigator Carter's failure to take custody

of the .22 Winchester rifle and have it tested for comparison with the bullets recovered at the

crime scene, while certainly a significant oversight, rises to the level of "outrageous

misconduct," as there was no evidence to indicate something more than negligence on the part of

the officer.  Akins, 588 F.3d at 1184 ("An officer's negligent failure to investigate

inconsistencies or other leads is insufficient to establish conscience-shocking misconduct.").

 Accordingly, the Court grants Hash's request for habeas relief on Claim IIB because

Hash has come forward with sufficient evidence, regarding the manner in which the police and

Prosecution handled his case, to show that his conviction was "brought about by methods that

offend 'a sense of justice.'"  Rochin, 342 U.S. at 173-74.

## V.  Conclusion

 Notwithstanding the highly deferential AEDPA standard, the Court finds that Hash is

entitled to habeas corpus relief under 28 U.S.C. § 2254.  Having reviewed the voluminous record

in this case, the Court is disturbed by the miscarriage of justice that occurred in this case and

finds that Hash's trial is an example of an "'extreme malfunction[] in the state criminal justice

system[].'"  Harrington, 131 S. Ct. at 786 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)).  For the foregoing reasons, the Court **GRANTS** Hash's petition for a writ of habeas corpus with respect to each of his four claims.  Petitioner's conviction and sentence are **VACATED**.  *Respondent shall either retry Petitioner within a reasonable time, not to exceed six (6) months, or release him.*  An appropriate order shall issue.

**ENTER:** This 28th day of February, 2012.

Senior United States District Judge