CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 03 2013

JULIA C. DUDLEY, CLERK
BY: /s/ S. Moody
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| MICHAEL HASH, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 3:12-cv-00065 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| GARY CLOSE, SCOTT JENKINS, JAMES | ) By: Hon. Glen E. Conrad |
| MACK, CALVIN BRUCE CAVE, MARY | ) Chief United States District Judge |
| PETERS DWYER, and PAUL CARTER | ) |
| | ) |
| Defendants. | ) |

Plaintiff Michael Hash brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging violations of the due process clause of the Fourteenth Amendment, as well as several violations of state law. The case stems from the wrongful conviction of Hash for the 1996 murder of Thelma Scroggins. The plaintiff has filed a complaint alleging eight counts of prosecutorial and police misconduct. Specifically, the plaintiff asserts claims for false arrest, fabrication of evidence, pre-conviction suppression of favorable evidence, conspiracy to violate constitutional rights, post-conviction suppression of evidence, malicious prosecution under Virginia law, and false imprisonment under Virginia law. The defendants are a mix of prosecutors, police investigators, a prison official, and a jailhouse informant. One of the defendants, Scott Jenkins, is the Culpeper County Sheriff and was the lead detective during the investigation that led to Hash's arrest and conviction. Jenkins is named in all eight counts of the complaint. He has filed a motion to dismiss Count Four of the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). The plaintiff alleges in Count Four that Jenkins, along with James Mack, another Culpeper County investigator, violated Hash's right to due process and a

fair trial by suppressing evidence favorable to him prior to his conviction. For the reasons stated below, the court will deny the defendant's motion.

## I. Background

Hash was convicted in the Circuit Court of Culpeper County for the capital murder of Thelma Scroggins on February 9, 2001. The killing took place in 1996, when Hash was 15 years old. The conviction was based, in part, on "eyewitness" testimony from Eric Weakley, an alleged co-conspirator with whom Hash allegedly committed the crime; testimony from Alesia Shelton, Hash's cousin who described incriminating statements made to her by Hash and his co-defendants; and the testimony of Paul Carter, an inmate who stated that Hash confessed the crime to him while in prison together.[1] Hash maintained his innocence during trial and throughout more than a decade in prison. Following the trial, he appealed his conviction to the Court of Appeals of Virginia, which affirmed his conviction. The Supreme Court of Virginia then denied Hash's petitions for appeal and rehearing. Thereafter, the plaintiff filed a petition for habeas corpus in the Culpeper County Circuit Court, which denied his claims. The plaintiff appealed this judgment to the Supreme Court of Virginia, which denied his petition and affirmed the circuit court decision. On April 15, 2010, the plaintiff filed a federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In an amended petition filed on July 2, 2010, Hash set forth four claims: two allegations of constitutionally ineffective assistance of counsel, and two allegations that the Commonwealth violated his due process rights by (1) concealing favorable information from him, and (2) engaging in extreme prosecutorial and police misconduct during the course of the investigation and prosecution.

---

[1] Hash alleges that the defendants orchestrated his transfer to Albemarle Regional Jail for the purpose of putting him in contact with Carter, a prolific government informant. Hash spent only two days at the facility before being transferred again, and the supposed confession occurred on the one night he shared a cell block with Carter.

2

On February 28, 2012, Judge James C. Turk granted Hash's petition for habeas relief as to all four of his claims, vacated his conviction, and ordered the Commonwealth either to retry Hash within six months or release him from custody. Hash was eventually released, and the charges against him were dropped. As to Hash's concealment and misconduct claims, which serve as the basis for the complained of behavior in the case sub judice, Judge Turk held that the Culpeper Commonwealth Attorney's Office and the Culpeper Sheriff's Office concealed evidence favorable to Hash and engaged in gross misconduct that violated Hash's guarantees of due process and a fair trial. Noting "a cavalcade of evidence," Judge Turk explained the multiple police and prosecutorial transgressions entitling Hash to relief. Hash v. Johnson, 845 F. Supp. 2d 711, 749 (W.D. Va. 2012). Regarding Hash's allegations specifically concerning the police investigation, the Court found that he had successfully demonstrated at least three instances of improper concealment of evidence by the investigators: First, Weakley was coached by Jenkins and Mack on important details of the crime, bolstering his testimony at trial, and this fact was never revealed to Hash or his counsel. Second, Jenkins made "a promise" to Paul Carter "to talk to the U.S. Attorney on behalf of Carter regarding his federal sentence." Id. at 719. The Court found that "Jenkins' offer to assist Carter with his federal sentence may have appeared to be contingent on the strength of Carter's testimony at Hash's trial, thereby increasing Carter's motivation to testify falsely." Id. at 747. These conversations, as well as additional correspondence between Jenkins, Mack, and Carter, were not disclosed to Hash's counsel. Finally, the results of failed polygraph examinations of both Weakley and Shelton were not disclosed. Id. at 747-51.

The Court stated "the conduct of Investigator[] Jenkins . . . rises to the level of outrageous misconduct because the acts were intentional and not merely negligent," and

3

concluded that "the cumulative effect of this misconduct violated Hash's right to due process." Id. at 751. Although the Court at times considered the police and prosecutorial misconduct in tandem, ultimately the Court distinguished between the different standards necessary to establish violations for each, and held that the intentional withholding of material information on the part of the police investigators independently violated Hash's constitutional right to a fair trial. Id. at 751-52.

## II. Discussion

### A. Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6), the court must "accept as true all well-pleaded allegations" and construe those allegations in the light most favorable to the plaintiff. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Presley v. City of Charlottesville, 464 F.3d 480, 483 (4th Cir. 2006). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

### B. Analysis

In Count Four of the complaint, the plaintiff alleges that:

Jenkins and Mack suppress[ed] . . . favorable evidence prior to Hash's conviction in violation of Hash's Fourteenth Amendment rights to due process and a fair trial.

. . .

Defendants Jenkins and Mack knew their suppression of favorable evidence violated Hash's rights.

4

. . .

> Defendants Jenkins' and Mack's suppression of the truth about their dealings with witnesses and potential witnesses led to Hash's conviction and incarceration. Hash's conviction and lengthy incarceration were the reasonably foreseeable results of Jenkins' and Mack's suppression of favorable evidence.

The question presented to the court is whether the alleged suppression of evidence by the investigating officers states a legal claim for a violation of Hash's constitutional rights under the Fourteenth Amendment. Jenkins contends that they do not, based on a concurring opinion by Judge Wilkinson in Jean v. Collins, 221 F.3d 656 (4th Cir. 2000) (en banc) ("Jean II" or "concurrence"). In Jean II, an equally divided en banc court affirmed the District Court's grant of summary judgment in favor of a police officer defendant who was accused of failing to disclose exculpatory evidence.[2] The case had been remanded to the Fourth Circuit for reconsideration in light of the Supreme Court's decision in Wilson v. Layne, which held that "[a] court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all . . . .'" 526 U.S. 603, 609 (1999) (quoting Conn v. Gabbert, 526 U.S. 286, 290 (1999)). The question before the Fourth Circuit on remand was whether the plaintiff had established an independent constitutional violation on behalf of the investigating police officers—as opposed to the prosecutors—for their failure to turn over exculpatory evidence prior to trial. Jean II, 221 F.3d at 659. The concurrence noted that, while the Supreme Court decisions in Brady v. Maryland, 373 U.S. 83 (1963), and its progeny establishing a duty on behalf of prosecutors to turn over exculpatory evidence to the defendant do not address the duty of police officers to do the same, lower court cases, including

---

[2] The opinion for affirmance was signed by six members of a twelve-member en banc court and thus is not binding authority, although it is certainly persuasive. Arkansas Writers Project, Inc. v. Radland, 481 U.S. 221, 234 n. 7 (1987) (citing Neil v. Biggers, 409 U.S. 188, 192 (1972)) ("[A]n affirmance by an equally divided court is not entitled to precedential weight.").

5

some from within the Fourth Circuit, have "pointed toward such a duty." Jean II, 221 F.3d at 659. For example, in Goodwin v. Metts, the Fourth Circuit held that "[a] police officer who withholds exculpatory information from the prosecutor can be liable under . . . § 1983." 885 F. 2d 157, 162 (4th Cir. 1989).³ Similarly, in Carter v. Burch, the Court noted that a police officer's failure to turn over materially exculpatory evidence "violate[d] [the § 1983 plaintiff's] constitutional rights." 34 F.3d 257, 264 (4th Cir. 1994); see also Brady v. Dill, 187 F.3d 104, 114 (1st Cir. 1999); Walker v. City of New York, 974 F.2d 293, 298-99 (2d Cir. 1992); Geter v. Fortenberry, 849 F.2d 1550, 1559 (5th Cir. 1988); Sanders v. English, 950 F.2d 1152, 1162 (5th Cir. 1992); Jones v. City of Chicago, 856 F.2d 985, 993-96 (7th Cir. 1988); McMillan v. Johnson, 88 F.3d 1554, 1566-70 (11th Cir.), amended by 101 F.3d 1363 (11th Cir. 1996).

Noting that these cases have left some question as to the exact nature of the duty of police officers with regard to exculpatory evidence, the concurrence attempted to clarify the ambiguity by articulating two necessary characteristics that a § 1983 plaintiff must prove to be entitled to relief on such claims: (1) the officer intentionally, and in bad faith, withheld exculpatory evidence from the prosecution; and (2) the suppression led to a wrongful conviction that was subsequently overturned based upon the alleged Brady violation. Jean II, 221 F.3d at 559-663. Given that the plaintiff in Jean II had not alleged that the officers acted in bad faith, the concurrence chose not to address the precise contours of an officer's duty to disclose exculpatory information. Id. at 663. The concurrence did, however, offer some preliminary guidance on fulfilling the two requirements, particularly the bad faith element. The concurrence first

---

³ Following the Supreme Court's decision in Albright v. Oliver, 510 U.S. 266 (1994), the Fourth Circuit limited the scope of Goodwin to cases where the plaintiff alleges a violation of his procedural due process right to a fair trial. See Taylor v. Waters, 81 F. 3d 429, 436 n. 5 (4th Cir. 1996) ("To the extent that Goodwin bases its holding on a conclusion that the officer's failure to disclose exculpatory evidence deprived the § 1983 plaintiffs of a liberty interest in avoiding prosecution on less than probable cause, that reasoning has been rejected in Albright. But, to the extent that Goodwin ruled that the officer's failure to disclose the exculpatory information deprived the § 1983 plaintiffs of their right to a fair trial, its holding is not affected by Albright."). The plaintiff here alleges violations of his procedural due process right to a fair trial.

6

differentiated the duty of police officers in dealing with exculpatory evidence from the broader "no fault" obligations required of prosecutors under Brady. Id. at 661. The concurrence explained:

> The Brady duty is framed by the dictates of the adversary system and the prosecution's legal role therein. Legal terms of art define its bounds and limits. The prosecutor must ask such lawyer's questions as whether an item of evidence has "exculpatory" or "impeachment" value and whether such evidence is "material." It would be inappropriate to charge police with answering these same questions, for their job of gathering evidence is quite different from the prosecution's task of evaluating it.

Id. at 660. Thus, police officers cannot be sued merely for failing to live up to the standards Brady demands of prosecutors; rather, they subject themselves to suit only when they intentionally damage a criminal defendant's right to a fair trial by the "concealment, doctoring, or destruction of evidence." Id. at 663. In Daniels v. Williams, the Supreme Court stated "that the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." 474 U.S. 327, 328 (1986). In light of this, Jean II noted that "[u]nder Daniels, then, police officer negligence or inadvertence in failing to turn over evidence cannot be actionable under § 1983." Jean II, 221 F.3d at 660; see also Arizona v. Youngblood, 488 U.S. 51, 55 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

The varied standards for police officers and prosecutors reflect the fundamentally different postures of a criminal defendant who seeks to have his conviction overturned on the basis of a Brady violation, and a § 1983 plaintiff who seeks to hold individuals accountable for violating his constitutional rights. See Jean II, 221 F.3d at 661 n.2 ("[The] dissent [improperly] conflates the standards of a Brady violation with the standards of a § 1983 claim."). As Jean II

7

noted, "[w]hen Brady violations occur, criminal defendants may have their convictions overturned." Id. at 661. However, the purpose of a § 1983 action is "to compensate persons for injuries caused by the deprivation of constitutional rights." Carey v. Piphus, 435 U.S. 247, 254 (1978).

Reflecting this distinction, the concurrence refused "to impose a sweeping duty on police" to adhere to precisely the same disclosure requirements as prosecutors, "a duty [which] would widen the legal gulf between prosecutors and police to such an extent as to make scapegoats of police for every item of evidence discovered post-trial." Jean II, 221 F.3d at 661. Instead, a § 1983 plaintiff in an action against police officers must prove violations of his due process rights through malicious, intentional acts established by evidence strong enough to "negate any negligent or innocent explanation for the actions on the part of the police." Id. at 663.

As mentioned above, Jean II's second requirement demands that § 1983 plaintiffs in suits against police officers for the suppression of evidence show that the alleged failure to disclose resulted in a constitutional injury. "In this context, the constitutional deprivation must be defined as a deprivation of liberty without due process of law. In the absence of a cognizable injury, such as a wrongful criminal conviction, police suppression of evidence might still give rise to claims under state law. But unless the § 1983 plaintiff can point to a constitutional injury caused by the suppression, no § 1983 remedy will lie." Id. at 659-60 (citations omitted). The concurrence further explained that "[a] Brady violation that resulted in the overturning of the § 1983 plaintiff's conviction is a necessary, but not a sufficient, condition for § 1983 liability on the part of the police. It is a necessary condition because the Brady violation establishes the

8

requisite threshold of constitutional injury (a conviction resulting in loss of liberty) below which no § 1983 action can lie." Id. at 663.

With this legal backdrop in mind, the court turns to the parties' arguments. Jenkins has not, at least at this stage in the litigation, challenged Hash's allegations that the officers acted with the requisite bad faith needed to sustain a suppression claim against police officers. Instead, Jenkins maintains that Hash cannot show that his conviction was overturned on the basis of a Brady violation. He argues that Jean II created a formal requirement that the plaintiff show that his conviction was overturned specifically because of a Brady violation. Jenkins submits that Judge Turk's opinion never recognized a specific Brady violation, instead merely stating in a footnote that "[s]ome of the evidence that the Prosecutor failed to disclose may give rise to a Brady . . . violation, but the Court need not address that because a finding of prejudicial prosecutorial misconduct is sufficient to warrant habeas relief." Hash, 845 F. Supp. 2d at 751 n. 34 (emphasis added). According to Jenkins, the absence of a particularized finding of a Brady violation at the habeas stage precludes a suppression of evidence claim against the investigating officers.

The court does not agree. The defendant's position requires an overly narrow reading of both Judge Turk's opinion and Jean II. First, Judge Turk did, in fact, recognize a specific Brady violation on the part of the Culpeper County prosecutor's office as a basis for overturning Hash's conviction. Although Jenkins correctly quotes Judge Turk as saying that he need not determine whether any of the officials' actions resulted in a Brady violation, see id. at 751 n. 34, this section of the opinion dealt with Hash's general allegations of prosecutorial and police misconduct. Immediately preceding this section of the opinion, however, Judge Turk addressed Hash's narrower claim that the Commonwealth wrongfully concealed the prosecution's deal with

9

Paul Carter in violation of Hash's right to due process under Giglio v. United States, 405 U.S. 150, (1972) and Napue v. Illinois, 360 U.S. 264 (1959). In this section of the opinion, the Court determined that the Culpeper officials' concealment of their discussions with Carter and their promise to work to reduce his federal sentence in exchange for help in obtaining Hash's conviction established an independent basis for granting Hash's § 2254 petition. The Court analyzed Giglio and Napue, and remarked that these cases "set a clear precedent, establishing that where a key witness has received consideration or potential favors in exchange for testimony and lies about those favors, the trial is not fair." Hash, 845 F. Supp. 2d at 741 (quoting Tassin v. Cain, 517 F.3d 770, 778 (5th Cir. 2008)). Finding that the deal with Carter was material to the jury's evaluation of his testimony, Judge Turk held that the Commonwealth's "failure to disclose the agreement and subsequent bolstering of Carter's false testimony violated Hash's due process rights under Giglio and Napue." Id. at 748. This finding is significant in light of the well understood proposition that the requirements of Giglio and Napue are drawn from the broader disclosure principles established in Brady. See United States v. Beckford, 962 F. Supp. 780, 786, 788 n. 2 (E.D. Va. 1997) ("Giglio material is merely a sub-set of the universe which comprises Brady material. . . . It is clear from the Fourth Circuit's analysis, then, that far from comprising separate and distinct bodies of evidence, the Brady doctrine encompasses both Giglio impeachment material and exculpatory evidence.") (citation omitted); see also United States v. Bagley, 473 U.S. 667, 677 (rejecting "any difference between exculpatory and impeachment evidence for Brady purposes," and explaining that the rule of Giglio "falls within the general rule of Brady." (quoting Giglio, 405 U.S. at 766) (alterations omitted). Thus, the Commonwealth's failure to disclose its agreement with Carter—a failure deemed by Judge Turk to be a violation of

10

Giglio and Napue—is independently sufficient to satisfy Jean II's requirement that Hash show that his conviction was overturned on the basis of a Brady violation.

Furthermore, the court believes that a fair reading of the remainder of Judge Turk's opinion affirmatively establishes that the Commonwealth committed multiple Brady violations that each contributed, at least in part, to the reversal of Hash's conviction. As outlined above, the Court addressed specific pieces of evidence that were improperly withheld from Hash's trial counsel: (i) communications between Culpeper officials and Paul Carter; (ii) the failed polygraph examinations by Weakley and Shelton; and (iii) the fact that Weakley was coached by Jenkins and Mack on important details of the crime. The Court, while not definitively ruling on whether the failure to disclose each piece of evidence amounted to a Brady violation, held that, in the aggregate, the police and prosecutorial misconduct in the case amounted to a violation of Hash's due process rights. Given that nearly all of the misconduct addressed by the Court involved, in one form or another, a failure to turn over exculpatory evidence, it is difficult to square Jenkins' position with that of Judge Turk. The Court was clearly distressed, and rightly so, about Jenkins' and Mack's failure to disclose important information to Hash, and this factored heavily in its decision to overturn Hash's conviction. To now read the Court's opinion as precluding a § 1983 action against the officers merely because there were numerous, independent bases for overturning the conviction misrepresents Judge Turk's concern over the investigators' actions. See Chapman v. Rhoney, No. 1:10cv258, 2011 WL 7971750, at *8 (W.D.N.C. Aug. 3, 2011) (holding that a plaintiff stated a valid § 1983 claim against police officers for their alleged failure

to turn over exculpatory evidence when the plaintiff's conviction was "based, in part, on a Brady violation.") (emphasis added).[4]

The court also believes that Jenkins' position states an overly narrow view of the Jean II concurrence. As stated earlier, the concurrence explained that an overturned conviction on the basis of a Brady violation is a necessary condition for prosecuting suppression claims against police officers. Jean II, 221 F.3d at 663. However, the concurrence went on to clarify that "[i]t is a necessary condition because the Brady violation establishes the requisite threshold of constitutional injury (a conviction resulting in loss of liberty) below which no §1983 action can lie." Id. In this case, there is no question that Hash can establish "the requisite threshold of constitutional injury"—he was wrongfully imprisoned for over ten years. This case thus presents no danger of improperly lowering the bar for the use of § 1983 as a means of redressing official misconduct. Hash has alleged that Jenkins improperly concealed material evidence from his defense, and that this concealment violated his constitutionally protected right to a fair trial, resulting in his wrongful imprisonment. Indeed, taking Hash's allegations as true, this case presents precisely the kind of harm that § 1983 is meant to remedy and deter.

As the plaintiff points out, Jenkins' interpretation of Jean II would improperly broaden the "favorable termination" requirement articulated by the Supreme Court in Heck v. Humphrey, 512 U.S. 477, 486-87 (1994). This simply requires § 1983 plaintiffs seeking to recover damages for unconstitutional imprisonment to first prove that their convictions have been successfully overturned. Id. The Supreme Court explained that the absence of such a rule would undermine

---

[4] It is also not necessary for the Court to have used any "magic words" in ruling that a Brady violation occurred during the plaintiff's trial. Technically, the duty imposed by Brady is an obligation on prosecutors, not police officers. Kyles v. Whitley, 514 U.S. 419, 437 (1995) (noting that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). However, "semantics aside, it is clear that, in essence, where a law enforcement officer 'suppresses' favorable evidence such that the prosecutor fails to learn of it, a violation of the Brady doctrine by the prosecutor results." Lynn v. Tarney, 405 F. App'x 753, 762 n. 4 (4th Cir. 2010) (unpublished).

"the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." Id. at 492-93. Nothing in this requirement, however, is meant to curtail § 1983 as a means of redressing unconstitutional behavior. See Wilson v. Johnson, 535 F.3d 262, 265 (4th Cir. 2008) ("Absent a statutory edict to the contrary or a restriction within the common law, the reach of § 1983 should not be compromised. Indeed, the Court has given full effect the language of § 1983 by recognizing that § 1983 provides a remedy, to be broadly construed, against all forms of official violation of federally protected rights."). The court does not believe that Jean II staked out a new, separate restriction on the use of § 1983 on this ground. Although Jenkins is correct in noting the concurrence's hesitancy in opening the door to § 1983 suppression claims against police officers, those concerns are addressed by the implementation of a "bad faith" requirement. This was the driving force of Jean II, and the topic on which the Court devoted nearly all of its reasoning. The requirement that a plaintiff allege a sufficient constitutional injury was discussed in only two short sections of the opinion, and merely addressed the unremarkable proposition that a plaintiff be required to allege a valid constitutional injury before seeking redress under § 1983.[5]

In short, the court believes that the plaintiff has satisfied both of Jean II's requirements: he has alleged bad faith on the part of the police investigators, and he has alleged the existence of a Brady violation (indeed he has alleged several such violations) that served as a basis for

---

[5] This is particularly clear given the concurrence's explanation of Albright v. Oliver's limitation on concealment claims. See Jean II, 221 F.3d at 659-60 (noting that Albright rejected the proposition that an "officer's failure to disclose exculpatory evidence deprived the § 1983 plaintiffs of a liberty interest in avoiding prosecution on less than probable cause") (quoting Taylor, 81 F.3d at 436 & n. 5). As a result of Albright's restriction, a plaintiff who claims, for example, a liberty deprivation based on pre-trial detention without probable cause, fails to allege a constitutional injury properly redressable by § 1983. It is this type of misapplication of § 1983 that Jean II's second threshold requirement protects against. As mentioned above, however, this limitation is inapplicable to the case at hand, as Hash alleges a violation of his procedural due process right to a fair trial, an injury that remains redressable under Goodwin v. Metts. See Taylor, 81 F.3d at 436 n. 5 (noting that, after Albright, Goodwin continues to support suppression claims against police officers, if "only where the officer's failure to disclose the exculpatory information deprived the § 1983 plaintiffs of their right to a fair trial") (emphasis added).

overturning his conviction. Neither Jean II nor any other controlling case requires anything more at the pleading stage.[6]

### III. Conclusion

For the foregoing reasons, the court believes the plaintiff's allegations against the defendants in Count Four state a viable constitutional claim for the suppression of exculpatory evidence by police officers. Accordingly, the defendant's motion to dismiss will be denied.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

**ENTER**: This 3rd day of July, 2013.

_____
Chief United States District Judge

---

[6] The court recognizes, however, that defendant's counsel was correct in noting at oral argument that Brady and its progeny cover specific duties of the prosecution team and do not extend to every instance where exculpatory information goes unused in a criminal trial. For example, the Brady doctrine is unavailable to criminal defendants whose trial counsel fails to utilize information readily accessible to it. See, e.g., United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990). Consequently, Hash will ultimately have to prove that the evidence at issue was in fact improperly concealed from the defense, and not simply that the defense failed to make use of available information. However, sufficient for this stage of the litigation, the plaintiff has alleged actual and intentional concealment. The court also notes that the plaintiff is aided by the fact that Judge Turk has already held that the information was purposely concealed from the defense team.

14